1  Jack C. Hsu, Esq., SBN 224908
   CHRISTENSEN EHRET LLP
2  222 West Adams Street
   Suite 2170
3  Chicago, Illinois 60606
   Telephone (312) 634-1014
4  Facsimile (312) 634-1018
   jhsu@christensenehret.com
5

FILED

08 JAN 29 PM 3: 46

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                    DEPUTY

6  Attorneys for Plaintiff, CATLIN UNDERWRITING AGENCIES LIMITED

7

8

9

10                        UNITED STATES DISTRICT COURT

11                      SOUTHERN DISTRICT OF CALIFORNIA

                             '08 CV 0173 WQH JMA

12  CATLIN UNDERWRITING          )  Case No.:
    AGENCIES LIMITED,            )
13                              )  COMPLAINT FOR DAMAGES
                                )
14           ,      Plaintiff,   )
                                )
15  v.                          )
                                )
16                              )
    SAN DIEGO REFRIGERATED       )
17  SERVICES, INC. D/B/A         )
    HARBORSIDE D/B/A SAN DIEGO   )
18  TERMINALS, PLA-ART           )
    INTERNATIONAL D/B/A SAN      )
19  DIEGO COLD STORAGE, SAN      )
    DIEGO COLD STORAGE, INC.,    )
20  MIGUEL CUEVA A/K/A MIGUEL    )
    TAMAYO, SERGIO HERNANDEZ,    )
21  MARCUS FOODS, INC., and DOES 1 )
    to 100, Inclusive,          )
22                              )
             Defendants.        )
23                              )
                                )
24  ─────────────────────────── )

25                   __PLAINTIFFS' COMPLAINT AT LAW__

26       Catlin Underwriting Agencies Limited ("Catlin"), for its Complaint against

27  San Diego Refrigerated Services, Inc. d/b/a Harborside d/b/a San Diego Terminals,

28  PLA-ART International d/b/a San Diego Cold Storage, San Diego Cold Storage,

                                      1

**COMPLAINT FOR DAMAGES**

118875



Inc., Miguel Cueva a/k/a Miguel Tamayo, Sergio Hernandez, Unknown Defendants DOE 1-100, and Marcus Foods, Inc., states as follows.

## NATURE OF DISPUTE

1.    This is an insurance coverage dispute arising out of an insurance policy referenced by certificate number LON7081-05 (the "Policy") subscribed to by Catlin and issued to San Diego Refrigerated Services, Inc. d/b/a Harborside d/b/a San Diego Terminals and PLA-ART International d/b/a San Diego Cold Storage.

## PARTIES

2.    Catlin is and at all times relevant hereto was organized under the laws of the United Kingdom with its principal place of business in London, England. Catlin was authorized to do business and was actually doing business at all relevant times in California.

3.    Upon information and belief, Defendants San Diego Refrigerated Services, Inc. d/b/a Harborside d/b/a San Diego Terminals is a corporation with its principal place of business in California. San Diego Refrigerated Services, Inc. d/b/a Harborside d/b/a San Diego Terminals is engaged in the business of operating cold storage warehouse facilities.

4.    Upon information and belief, PLA-ART International d/b/a San Diego Cold Storage is a corporation with its principal place of business in California. PLA-ART International d/b/a San Diego Cold Storage is engaged in the business of operating cold storage warehouse facilities.

5.    Upon information and belief, San Diego Cold Storage, Inc. is an alias of San Diego Refrigerated Services, Inc. d/b/a Harborside d/b/a San Diego Terminals and/or PLA-ART International d/b/a San Diego Cold Storage.

6.    Upon information and belief, Miguel Cueva a/k/a Miguel Tamayo is a resident of California.

7.    Upon information and belief, Sergio Hernandez is a resident of California.

2

---

**COMPLAINT FOR DAMAGES**

118875

8.    Upon information and belief, Marcus Foods, Inc. (hereinafter "Marcus Foods") is a corporation organized under the laws of California with its principal place of business in California.

## JURISDICTION AND VENUE

9.    This court has subject matter jurisdiction over this matter based on diversity of citizenship between Catlin and Defendants, pursuant to 28 USC § 1332(a)(2).

10.    The amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

11.    Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) and (2) because San Diego Refrigerated Services, Inc. d/b/a Harborside d/b/a San Diego Terminals and PLA-ART International d/b/a San Diego Cold Storage reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

**A.    INSURANCE POLICY**

12.    Catlin is a subscriber to a policy of insurance referenced by certificate number LON7081-05, with a "Named **Insured**" identified, among others, as PLA-ART International d/b/a San Diego Cold and a policy period from January 1, 2006 to January 1, 2007 (the "Policy"). A true and accurate copy of the Policy is attached and incorporated herein as **Exhibit A**.

13.    The Policy has limits of liability of $3.5 million and a deductible of $10,000 "per **occurrence**."

14.    The Policy provides "warehouseman's legal liability coverage" as follows:

/ / /

/ / /

/ / /

3

---

**COMPLAINT FOR DAMAGES**

118875

CHRISTENSEN EHRET LLP

CHRISTENSEN EHRET LLP

## WAREHOUSEMAN'S LEGAL LIABILITY COVERAGE

### A.   COVERAGES

In consideration of premium charges hereinafter provided and subject to the following terms, conditions, exclusions, and limitations, this **Company** agrees:

1.     a.     To pay on behalf of the **Insured** those sums that the **Insured** becomes legally obligated to pay for **Property Damage** by reason of liability imposed upon the **Insured** as a warehouse operator or bailee resulting from an **occurrence** during the Certificate period.

2.     a.     We may, at our discretion, investigate any **occurrence** and settle any claim or suit that may result, but the amount we will pay for damages, is limited as described in section C. Limits of Liability.

      b.     The **Company** has the right and duty, to defend any suit or other proceedings which may be brought against the **Insured** to enforce claims, even if such suits or proceedings are groundless, false or fraudulent.  But:

\*     \*     \*

      (4)     **Company** has no duty to defend the **Insured** against any suit or other proceedings seeking damages to which this insurance policy does not apply.

      c.     We will pay, irrespective of the **Company**'s "Limit(s) of Liability" otherwise specified herein:

\*     \*     \*

      (2)     all expenses of litigation and all costs taxed against the **Insured** in proceedings defended by the **Company**.

\*     \*     \*

### F.   DEFINITIONS

1.     The unqualified word "**Insured**" includes the Named **Insured** and also includes any executive officer, director, employee, or stockholder thereof while acting within the scope of his/her duties as such, and if the Named **Insured** is a partnership, the unqualified word "**Insured**" also includes any partner therein but only with respect to his/her liability as such. However, as respects Notice of Cancellation, it will only be necessary for this **Company** to send such notice to the Named **Insured** as stated in this Insurance.

\*     \*     \*

4

---

**COMPLAINT FOR DAMAGES**

118875

3.    **"Property Damage"** means physical loss, damage or destruction to tangible, personal **Property Damage** owned by others in the care, custody or control of the **Insured** while on the Premises of the **Insured** and includes loss of use of such **Property Damage**.    **Property Damage** Damage includes the reasonable and necessary costs incurred to remove the debris of such **Property Damage** after an **Occurrence**.    **Property Damage** includes actual loss of profits not to exceed those profits, which would have been realized from the sale of the lost, damaged or destroyed **Property Damage**.    **Property Damage** Damage does not include any other consequential damages including, but not limited to, personal injury, other profit losses, or damage to reputation or goodwill.

4.    The term **"Occurrence"** wherever employed in this Insurance, is defined as (1) an accident that takes place during the period of insurance under this Certificate, or (2) in the absence thereof, a continuous or repeated exposure to conditions which unexpectedly cause loss or destruction of or damage to tangible **Property Damage** during the period of insurance under this Certificate, and all such exposure to substantially the same general conditions existing at or emanating from any one Premises specified in the Supplemental Declarations shall be deemed one **Occurrence**.

15.    The Policy defines the words "we," "us," and "our" as the "Company" (Catlin) and the words "you" and "your" as the "Named **Insured**."    The **"Company"** is Underwriters.

16.    The Policy defines **"Premises"** as the building located at the address shown in the Supplemental Declarations, which is occupied by the **"Insured"** as a public warehouse.    Here, the Schedule of Covered **Premises** lists the location as 1240 West 28th Street, National City, California 91950-6319.

17.    The Policy's Section G, Loss Conditions, Paragraph 1, Duties In The Event Of Accidents, Claim, Or Suit, provides:

a. The **Insured**, upon knowledge of a claim or of any **Occurrence** which may give rise to a claim, shall give written notice thereof, with the most complete information obtainable, to the **Company** or its authorized agent, as soon as practicable.    If such **Occurrence** involves a violation of law, immediate notice thereof shall be given by the **Insured** to the public police or other peace authorities having jurisdiction.    If claim is made or suit is brought against the **Insured**, the **Insured** shall immediately forward to the **Company** or its authorized agent every demand, notice,

CHRISTENSEN EHRET LLP

5

**COMPLAINT FOR DAMAGES**

118875

1  summons, or other process received by him or his
2  representative.

3  **B.    RELEASE OF MARCUS FOODS PRODUCT**

4    18.    In 2006, Marcus Foods stored its food product with San Diego

5  Refrigerated Services, Inc. d/b/a Harborside d/b/a San Diego Terminals, PLA-ART

6  International d/b/a San Diego Cold Storage, and/or San Diego Cold Storage, Inc.

7  (hereinafter, collectively "San Diego") at San Diego's warehouse facility at 1240

8  West 128th Street, National City, California.

9    19.    In and around August 2006, Marcus Foods suspected that its product

10 stored at San Diego's warehouse facility above had been allegedly released and/or

11 was being released without Marcus Foods' authorization, consent, or knowledge.

12   20.    Specifically, Marcus Foods believed that more product was being

13 allegedly released to its customers than it authorized, and that said product was

14 being allegedly released without any paperwork received or generated by San

15 Diego.

16   21.    In and around August 2006, Marcus Foods asked San Diego for a

17 physical inventory count of Marcus Foods product stored at San Diego's warehouse

18 facility above.

19   22.    San Diego complied with Marcus Foods' request for a physical

20 inventory count, and a physical inventory count of Marcus Foods product stored at

21 San Diego's warehouse facility above was conducted.

22   23.    In and around August 2006, Marcus Foods informed San Diego that

23 San Diego had allegedly released and/or was releasing Marcus Foods product from

24 San Diego's warehouse without Marcus Foods' authorization, consent, or

25 knowledge.

26   24.    At that time, Marcus Foods informed San Diego that San Diego had

27 allegedly released and/or was releasing more product to Marcus Foods customers

28 than was authorized by Marcus Foods.

CHRISTENSEN EHRET LLP

6

**COMPLAINT FOR DAMAGES**

118875

25.    One of these Marcus Foods customers was Del Rancho Foods.

26.    On August 8, 2006, Marcus Foods and Del Rancho Foods entered into a Memo of Understanding ("Memo").  A true and accurate copy of the Memo is attached and incorporated herein as **Exhibit B**.

27.    The Memo provided that:

> I, Alberto Sanchez, owner of Del Rancho Foods, agree to the following terms of my meeting with Jerry Marcus, August 8, 2006 at Marcus Food **Company**, Inc.
>
> 1. I will have my accountants call Jerry tomorrow, August 9, to discuss the viability and profitability of Del Rancho Foods.
> 2. I will send weekly to Jerry my P&L statement for the previous week.  In addition, I will send my balance sheet monthly.  I will apprise Marcus Food **Company**, Inc. of my receivables, and make them aware of any problem areas, on a timely basis,
> 3. I will allow Marcus Food **Company**, Inc. to file UCC filings on my real business **Property Damage**, inventory, and equipment.
> 4.    I am assuming debt of approximately $479,000 comprised of the following
>      a.  Approximately $156,000 of current receivables due Marcus Food **Company**, Inc.
>      b.  Approximately $143,000 of products delivered to me by Sergio Hernandez that was not invoiced by Marcus Food **Company**, Inc.
>      c.    Approximately $80,000 of outstanding receivables to Henry Hernandez
>      d.    $100,000 of misappropriated funds by Sergio Hernandez from Henry Hernandez.

28.    In September 2006, San Diego had knowledge of the Memo.

29.    On September 6, 2006 at 2:19 p.m., San Diego faxed the Memo to "Harborside."

30.    In or around September 2006, Marcus Foods made a claim against San Diego for loss it purportedly suffered arising out of the alleged unauthorized release of Marcus Foods product to Del Rancho Foods, among others.

31.    At that time and shortly thereafter, Marcus Foods made a $125,000 demand against San Diego for loss it purportedly suffered arising out of the alleged unauthorized release of Marcus Foods product to Del Rancho Foods, among others.

7

---

**COMPLAINT FOR DAMAGES**

CHRISTENSEN EHRET LLP

32.    During this time and shortly thereafter, San Diego negotiated with Marcus Foods concerning the above purported loss and Marcus Foods' resultant claim against it.

33.    In December 2006, San Diego continued to negotiate with Marcus Foods concerning the above purported loss and Marcus Foods' resultant claim against it.

34.    Specifically, in response to Marcus Foods' $125,000 demand against it, San Diego made a counteroffer of $50,000.

35.    San Diego later retracted this counteroffer.

36.    Through March 2007, San Diego continued to negotiate with Marcus Foods concerning the above purported loss and Marcus Foods' resultant claim against it.

37.    Throughout this time, the Marcus Foods product that was allegedly released without authorization was readily traceable. Accordingly, at that time, the product could have been recovered in whole or in part and/or Marcus Foods' purported loss and claim substantially mitigated.

C.    **MARCUS FOOD COMPLAINT**

38.    On May 5, 2007 Marcus Foods filed a complaint against San Diego Cold Storage, Inc., Miguel Cueva and/or Miguel Tamayo, Sergio Hernandez, and unknown defendants DOE 1-100 styled *Marcus Foods v. San Diego Cold Storage, Inc., Miguel Cueva, Sergio Hernandez and DOES 1-10,* in the Superior Court of California, County of San Diego No. 37-200700066571-CU-CO-CTL (the "Marcus Foods Complaint"). A true and accurate copy of this letter is attached and incorporated herein as **Exhibit C**.

39.    The Marcus Foods Complaint alleges that San Diego Cold Storage, Inc., Miguel Cueva and/or Tamayo, Sergio Hernandez and DOE 1-100 (collectively, the "Marcus Foods Defendants") agreed, conspired, planned and engaged in the release and sale of Marcus Foods goods and food-products without the knowledge,

8

118875

CHRISTENSEN EHRET LLP

authorization, or consent of Marcus Foods, and as a result, San Diego Cold Storage, Inc. allegedly breached its contract with Marcus Foods, and Marcus Foods Defendants allegedly converted the product for their own use.

40.    The Marcus Foods Complaint alleges in relevant part that:

3. * * * SAN DIEGO COLD STORAGE is engaged in the business of providing warehouse and cold-storage facilities for hire, pursuant to California Commercial Code §7102(1)(h). The DEFENDANT'S SAN DIEGO COLD STORAGE facility is located at 1240 West 28th Street, in National City, California.

4. * * * DEFENDANT MIGUEL CUEVA is employed by DEFENDANT SAN DIEGO COLD STORAGE as the foreman of the SAN DIEGO COLD STORAGE facility located at 1240 West 28th Street, in National City, California.

5. * * * DEFENDANT SERGIO HERNANDEZ is an independent and self-employed sales-agent engaged in the business at DEFENDANT SAN DIEGO COLD STORAGE'S facility located at 1240 West 28th Street, in National City, California.

6. PLAINTIFF does not know the true names or capacities of those DEFENDANTS named herein as DOES 1 through 100. PLAINTIFF will amend this Complaint to allege their true names and capacities when the same have been ascertained, or according to proof at the time of trial.

7. * * * fictitiously named DEFENDANT is responsible in some manner for the acts and/or **occurrenc**es alleged hereafter, and that each DEFENDANT was authorized and/or empowered by the remaining DEFENDANTS in that PLAINTIFF'S losses as herein alleged were proximately caused by their acts and/or omissions. At all time relevant herein, each DEFENDANT was the agent and/or employee of each of the other DEFENDANTS and was at all times relevant herein acting within the purpose and scope of such agency and/or employment. At all times herein below, unless otherwise specified, DEFENDANTS SAN DIEGO COLD STORAGE, MIGUEL TAMAYO, SERGIO HERNANDEZ and Does 1 through 100, inclusive, will be referred to collectively as "DEFENDANTS" in the balance of the Complaint for Damages.

*      *      *

STATEMENT OF FACTS

8. On or about June of 2005 PLAINTIFF MARCUS FOODS and DEFENDANT SAN DIEGO COLD STORAGE entered into a written agreement (hereinafter the "CONTRACT")

CHRISTENSEN EHRET LLP

9

**COMPLAINT FOR DAMAGES**

118875

wherein DEFENDANT SAN DIEGO COLD STORAGE agreed to provide PLAINTIFF MARCUS FOODS with warehouse and cold-storage facilities for hire. The CONTRACT specifically provides for the transfer of PLAINTIFF MARCUS FOODS goods and products to DEFENDANT SAN DIEGO COLD STORAGE'S warehouse for storage and release of said products only to those MARCUS FOODS customers as PLAINTIFF MARCUS FOODS would direct.

\*       \*       \*

10. At the time of each PLAINTIFF'S delivery of said goods and food-products, a warehouse receipt was issued by DEFENDANT SAN DIEGO COLD STORAGE to PLAINTIFF MARCUS FOODS therefore. In return for valuable consideration paid by PLAINTIFF MARCUS FOODS, DEFENDANT SAN DIEGO COLD STORAGE accepted each of PLAINTIFF'S goods and food-products, and agreed to the storage and release of PLAINTIFF'S goods and food-products only to those MARCUS FOODS customers as PLAINTIFF MARCUS FOODS would direct.

11. In approximately February of 2006 and continuing for several months thereafter, DEFENDANTS and each of them agreed, conspired, planned and engaged in the release of and sale to third parties of PLAINTIFF'S goods and food-products without the knowledge, authorization or consent of PLAINTIFF MARCUS FOODS.

12. In approximately August 2006, PLAINTIFF MARCUS FOODS discovered the ongoing and unauthorized release of and sale to third parties of PLAINTIFF'S goods and food-products by the DEFENDANTS and each of them. The unauthorized release of PLAINTIFF'S goods and food-products by the DEFENDANTS was thereafter confirmed by DEFENDANT SAN DIEGO COLD STORAGE in August 2006.

\*       \*       \*

FIRST CAUSE OF ACTION
(Breach of Contract - -Against San Diego Cold Storage)

13. PLAINTIFF MARCUS FOODS re-alleges and incorporates by reference paragraphs 1 through 12, inclusive, as though fully set forth herein.

\*    \*    \*

16. PLAINTIFF MARCUS FOODS has demanded that DEFENDANT SAN DIEGO COLD STORAGE return said food products to PLAINTIFF, but DEFENDANT SAN DIEGO COLD STORAGE has failed and refused, and continues to fail and refuse to return PLAINTIFF'S goods and food-products.

10

CHRISTENSEN EHRET LLP

**COMPLAINT FOR DAMAGES**

<div align="center">CHRISTENSEN EHRET LLP</div>

1

2          SECOND CAUSE OF ACTION
          (Conversion – Against All Defendants)
3

4      18. PLAINTIFF MARCUS FOODS re-alleges and incorporates
          by reference paragraphs 1 through 17, inclusive, as though
          fully set forth herein.
5

6      19. By its wrongful release of, possession of, and exercise of
          dominion and control over PLAINTIFF'S goods and food-
7          products, DEFENDANTS and each of them converted the
          PLAINTIFF'S goods and food-products to and for their own
8          use.    The DEFENDANTS and each of them exercised
          possession and control of PLAINTIFF'S goods and food-
9          products and at all relevant times therein, had the power to
          sell to third parties the PLAINTIFF'S goods and food-
10         products without PLAINTIFF MARCUS FOODS'
          authorization or consent.

11                       *    *    *

12     WHEREFORE, PLAINTIFF MARCUS FOODS prays for judgment
    against DEFENDANT, and each of the, as follows:
13

14         1.    Compensatory damages in an amount according to proof;

15         2.    Consequential damages reasonably foreseeable as a result
                of the DEFENDANT'S ACTS AND/OR OMISSIONS.

16         3.    Punitive Damages, as to the Second Cause of Action only,
                to punish and deter the DEFENDANTS from future and
17               further actions as described therein;

18         4.    Attorneys Fees and Costs of Suit as provided by law; and

19         5.    For such other relief as the Court shall deem just and
                proper.
20

21     41.    Exhibit B of the Marcus Foods Complaint is an "Inventory of Missing

22  Product," identifying the particular goods allegedly missing (the subject of the

23  complaint) and totaling $129,812.90.

24     42.    Shortly after the Marcus Foods Complaint was served, San Diego

25  tendered defense of the complaint to Catlin.

26     43.    After the filing of the Marcus Foods Complaint in May 2007, San

27  Diego notified Catlin for the first time of (1) the events and/or conduct surrounding

28  the alleged unauthorized release of Marcus Foods product in 2006, (2) Marcus

                              11

---

**COMPLAINT FOR DAMAGES**

CHRISTENSEN EHRET LLP

1  Foods' purported loss arising out of such alleged unauthorized release of product,

2  and (3) Marcus Foods' claim against San Diego for such purported loss.

3      44.    San Diego waited approximately ten months from August or September

4  2006 until after the filing of the Marcus Foods Complaint in May 2007 to notify

5  Catlin of information it possessed in August or September 2006 that (1) the events

6  and/or conduct surrounding the alleged unauthorized release of Marcus Foods

7  product in 2006, (2) Marcus Foods' purported loss arising out of such alleged

8  unauthorized release of product, and (3) Marcus Foods' claim against San Diego for

9  such purported loss.

10     45.    The Marcus Foods Complaint was Catlin's first notice of events and/or

11  conduct surrounding the alleged unauthorized release of Marcus Foods product in

12  2006, the allegations in the Marcus Foods Complaint, and Marcus Foods' claim

13  against San Diego.

14     46.    On July 25, 2007, Catlin issued a letter declining San Diego's tender of

15  defense.  A true and accurate copy of this letter is attached and incorporated herein

16  as **Exhibit D**.

17                    **COUNT I**

18          **(IN THE ALTERNATIVE TO COUNT III)**

19  **DECLARATION OF NO COVERAGE BECAUSE NO OCCURRENCE**

20     47.    Catlin incorporate by reference the allegations contained in paragraphs

21  1 through 46 above, as though fully set out herein in this Count I.

22     48.    The Marcus Foods Complaint does not allege an **"Occurrence"** under

23  the Policy.

24     49.    The Marcus Foods Complaint does not allege conduct that constitutes

25  an "accident" or a "continuous or repeated exposure to conditions which

26  unexpectedly cause loss ***."

27     50.    Where the Marcus Foods Complaint alleges that the Marcus Foods

28  Defendants "agreed, conspired, planned and engaged in the release of and sale to

12

**COMPLAINT FOR DAMAGES**

118875

CHRISTENSEN EHRET LLP

1 third parties of [Marcus Foods goods] without [its] knowledge, authorization of
2 consent," the complaint alleges that Marcus Foods Defendants' conduct was
3 deliberate and calculated.

4    51.    The Marcus Foods Complaint does not allege exposure to some sort of
5 physical harm (wind, cold, mold, etc.) that results in **Property Damage** damage.

6    52.    At all relevant times herein, Marcus Foods has claimed and is claiming
7 that San Diego's conduct in releasing more product to Marcus Foods customers than
8 authorized by Marcus Foods was conduct that was premeditated, deliberate, and
9 intentional, not inadvertent or negligent.

10    53.    There is no duty to defend San Diego under the Policy with respect to
11 the Marcus Foods Complaint because the Marcus Foods Complaint does not allege
12 an "**Occurrence**."

13    54.    There is no duty to indemnify San Diego under the Policy with respect
14 to the Marcus Foods Complaint because the Marcus Foods Complaint does not
15 allege an "**Occurrence**."

16    55.    On the above basis, Catlin seeks a declaration that there is no coverage
17 under the Policy for San Diego with respect to the Marcus Foods Complaint.

**COUNT II**

**(IN THE ALTERNATIVE TO COUNT III)**

**DECLARATION OF NO COVERAGE BECAUSE SAN DIEGO**

**ACTED ONLY WILLFULLY**

22    56.    Catlin incorporates by reference the allegations contained in paragraphs
23 1 through 55 above, as though fully set out herein in this Count II.

24    57.    § 533 of the Insurance Code of California provides:

§ 533 Willful act of **Insured**

An insurer is not liable for a loss caused by the willful act of the **Insured**; but he is not exonerated by the negligence of the **Insured**, or of the **Insured**'s agents or others.

13

**COMPLAINT FOR DAMAGES**

118875

58.    The Marcus Foods Complaint alleges only willful and intentional conduct.

59.    At all relevant times herein, Marcus Foods has claimed and is claiming that San Diego's conduct in releasing more product to Marcus Foods customers than authorized by Marcus Foods was conduct that was willful and intentional, not inadvertent or negligent.

60.    On the above basis, Catlin seeks a declaration that there is no coverage under the Policy for San Diego with respect to the Marcus Foods Complaint.

## COUNT III

### (IN THE ALTERNATIVE TO COUNTS I, II, AND IV)

### DECLARATION OF NO COVERAGE BECAUSE SAN DIEGO BREACHED ITS DUTIES UNDER THE POLICY'S NOTICE PROVISIONS

61.    Catlin incorporates by response the allegations contained in paragraph 1 through 46 above, as though fully set out herein in this Count III.

62.    San Diego breached the Policy's Section G, Loss Conditions, Paragraph 1, Duties In The Event Of Accidents, Claim, Or Suit.

63.    San Diego failed to give Catlin written notice as soon as practicable of (1) the events and/or conduct surrounding the alleged unauthorized release of Marcus Foods product in 2006, and (2) Marcus Foods' purported loss arising out of such alleged unauthorized release of product.  Moreover, San Diego failed to give Catlin written notice immediately of Marcus Foods' claim against San Diego for such purported loss.

64.    San Diego's above failure to give timely notice substantially prejudiced Catlin.

65.    Because of San Diego's above failure, Catlin lost the ability to adjust, mitigate, and/or eliminate any liability and/or the amount of the purported loss. Catlin also lost the ability to assist in the potential recovery and/or negotiation of a compromise payment for the released product.

14

CHRISTENSEN EHRET LLP

---

**COMPLAINT FOR DAMAGES**

118875

66.     As a result of San Diego's above failure, Catlin has suffered actual and substantial prejudice.

67.     Catlin has no duty to defend or indemnify San Diego with respect to the Marcus Foods Complaint.

68.     On the above basis, Catlin seeks a declaration that San Diego breached its duties under the Policy's notice provision, Catlin was actually and substantially prejudiced as a result, and as such, there is no coverage under the Policy for San Diego with respect to the Marcus Foods Complaint.

<div align="center">

**COUNT IV**

**(IN THE ALTERNATIVE TO COUNT III)**

**DECLARATION THAT EXCLUSIONS 7, 10, AND 12 EXCLUDE**

**COVERAGE FOR MARCUS FOODS COMPLAINT**

</div>

69.     Catlin incorporates by reference the allegations contained in paragraphs 1 through 60 above, as though fully set out herein in this Count IV.

70.     The Policy provides the following exclusions under Section B of the Policy that there is no coverage:

    *     *     *

    7.     For loss, destruction, or damage to **Property Damage** caused by the infidelity or dishonesty of the **Insured** or any person or persons in the employment or service of the **Insured**, whether or not such an act or acts occur during the regular hours of employment or service.

    *     *     *

    10.    For any unexplained loss of **Property Damage**, and/or any mysterious disappearance of **Property Damage**, and/or any shortage of **Property Damage** provided that such loss, mysterious disappearance and/or shortage is based solely upon a discrepancy between a physical count and a book, computer or other inventory.

    *     *     *

    12.    For loss, destruction, or damage to **Property Damage** arising out of any processing performed by or on behalf of the **Insured**, unless endorsed herein. This exclusion does not apply to normal handling, freezing, and tempering.

<div align="center">15</div>

CHRISTENSEN EHRET LLP

---

<div align="center">

**COMPLAINT FOR DAMAGES**

</div>

118875

71. The Marcus Foods Complaint alleges that Marcus Foods allegedly suffered loss caused by infidelity or dishonesty of San Diego, its employees, and individuals in San Diego's service.

72. The Marcus Foods Complaint alleges that Marcus Foods allegedly suffered unexplained loss and shortage of product based upon a discrepancy between a physical count and a book, computer or other inventory.

73. The Marcus Foods Complaint alleges that Marcus Foods allegedly suffered loss arising out of any processing performed by or on behalf of San Diego.

74. The above exclusions exclude coverage for San Diego with respect to the Marcus Foods Complaint.

75. Catlin has no duty to defend or indemnify San Diego with respect to the Marcus Foods Complaint.

76. On the above basis, Catlin seeks a declaration that there is no coverage under the Policy for San Diego with respect to the Marcus Foods Complaint.

## RELIEF SOUGHT

Plaintiff Catlin respectfully prays for the following relief:

I. That as to Count I, this Court find and declare that the Policy does not provide coverage for San Diego with respect to the Marcus Foods Complaint, as the Marcus Foods Complaint does not allege an "**Occurrence**."

II. That as to Count II, this Court find and declare that the Policy does not provide coverage for San Diego with respect to the Marcus Foods Complaint, as § 533 of the Insurance Code of California applies where Marcus Foods has claimed and is claiming that San Diego's conduct in releasing more product to Marcus Foods customers than authorized by Marcus Foods was conduct that was willful and intentional, not inadvertent or negligent.

///

///

///

16

**COMPLAINT FOR DAMAGES**

118875

III.    That as to Count III, this Court find and declare find that that the Policy does not provide coverage for San Diego with respect to the Marcus Foods Complaint, as San Diego breached its duties under the Policy's notice provision, and Catlin was actually and substantially prejudiced as a result.

IV.    That as to Count IV, this Court find and declare that that the Policy does not provide coverage for San Diego with respect to the Marcus Foods Complaint, as exclusions 7, 10, and 12 apply to exclude coverage in this instance.

V.    That the Court award further relief as it deems just.

Dated: January 28, 2008                    CHRISTENSEN EHRET LLP


By: _____
    Jack C. Hsu, ESQ.
    Attorneys      for      Plaintiff,      CATLIN
    UNDERWRITING AGENCIES LIMITED

CHRISTENSEN EHRET LLP

17

**COMPLAINT FOR DAMAGES**

118875

| Previous No. LON7081-04 | Contract Ref. No  LC0514907 | Certificate No  LON7081-05 |
| --- | --- | --- |

1.    Named Insured and Mailing Address

**San Diego Refrigerated Services, Inc.**
**dba Harborside dba San Diego Terminals**
**PLA-Art International dba San Diego Cold**
**Otay Mesa Maintenance & Repair**
**Central California Warehousing Services, Inc. aka CCWS**
**Edward Plant**
**Frank Plant**
**PO Box 85001**
**San Diego, CA 92186-5001**

2.    Effective from  **1/1/2006    TO  1/1/2007**
both days at 12.01 a.m. local standard time

3.    Insurance is effective with 100% CERTAIN LLOYDS UNDERWRITERS

4.    Coverage
Insurance applies only for coverages shown below.  The limits of insurance and deductibles for each coverage
shown below are per the applicable supplemental declarations attached.

Coverage Forms
**Warehouseman's Legal Liability Coverage**

5.    Special Conditions or Non-Standard Endorsements (copies attached)
**Common Inland Marine Policy Conditions**
**Institute Radioactive Contamination, Chemical, Biological, Bio-Chemical and Electromagnetic**
**Weapons Exclusion Clause CL 370 dated 10.11.2003 as amended by the Radioactive Contamination**
**Exclusion Clause (USA Endorsement) dated 11 October 2003**
**Institute Service of Suit Clause (U.S.A.) CL 355 dated 1.11.92**
**Several Liability Notice LSW 1001 (Insurance)**

6.    Premium for all Coverage parts

Total Premium:              **$31,481.00**

CA Surplus Lines Tax              **$944.43**
CA Surplus Lines Stamping Fee              **$70.83**

EXHIBIT

A

7. <u>Service of Suit may be made upon:</u>
   LeBoeuf, Lamb, Greene and McRae
   1025 55th St
   New York, NY 10019-5389
   USA

Dated:

1/1/2006

By: _____

COVERHOLDER

**Warehouseman's Legal Liability**

**Attaching to and forming part of Certificate no. LON7081-05**

The following is added to the Declarations Page and applies to the  Warehouseman's Legal Liability Coverage Form.

---

1.      Named Insured

        **San Diego Refrigerated Services, Inc.**
        **dba Harborside dba San Diego Terminals**
        **PLA-Art International dba San Diego Cold**
        **Otay Mesa Maintenance & Repair**
        **Central California Warehousing Services, Inc. aka CCWS**
        **Edward Plant**
        **Frank Plant**

---

2.      Limits of Insurance

        Schedule of Covered Premises

| Location No. | Address | Limit of Insurance |
| --- | --- | --- |
| 01 | San Diego Refrigerated Services, Inc., 802 Terminal Street, San Diego, CA 92101-7813 | $5,000,000 |
| 02 | PLA-ART International dba San Diego Cold, 1240 West 28th Street, National City, CA 91950-6319 | $3,500,000 |
| 03 | Otay Mesa Maintenance & Repair, 8671 Lonestar Road, San Diego, CA 92154-7804 | $7,500,000 |

---

3.   .  Deductibles
        **$10,000 per occurence**

# WAREHOUSEMAN'S LEGAL LIABILITY COVERAGE

Various provisions in this Coverage Form restrict or limit coverage. Read the entire Coverage Form and Certificate to determine what is and is not covered, and each party's rights and duties.

Words and phases that appear in bold are defined in section **F. DEFINITIONS**

**A.**   **COVERAGES**

In consideration of premium charges hereinafter provided and subject to the following terms, conditions, exclusions, and limitations, this **Company** agrees:

1.  a.  To pay on behalf of the **Insured** those sums that the **Insured** becomes legally obligated to pay for **Property Damage** by reason of liability imposed upon the **Insured** as a warehouse operator or bailee resulting from an **occurrence** during the Certificate period.

     b.  To pay reasonable and necessary expenses incurred by the **Insured** during or after an **Occurrence** to protect, preserve, or recover customers' property stored at the **Insured's Premises** to prevent or mitigate actual or imminent loss, destruction or damage as a result of an **Occurrence** for which the **Insured** would be covered under the provisions of this Insurance. The amount paid for any such expenses will reduce the limits on this Insurance by the amount paid.

2.  a.  We may, at our discretion, investigate any **occurrence** and settle any claim or suit that may result, but the amount we will pay for damages is limited as described in section C. Limits Of Liability.

     b.  The **Company** has the right and duty, to defend any suit or other proceedings which may be brought against the **Insured** to enforce claims, even if such suits or proceedings are groundless, false or fraudulent. But:

        (1)  **Company** may make such investigation, negotiation and settlement of any claim or suit as the **Company** deems warranted whether such claim exceeds policy deductible or not;

        (2)  **Company** reserves and shall have the right to select defense attorneys and determine reasonable and appropriate compensation for those defense attorneys;

        (3)  **Company**'s right and duty to defend shall end when **Company** has paid or tendered the applicable limit of insurance to one or more claimants.

        (4)  **Company** has no duty to defend the **Insured** against any suit or other proceedings seeking damages to which this insurance does not apply.

     c.  We will pay, irrespective of the **Company**'s "Limit(s) of Liability" otherwise specified herein:

        (1)  all expenses incurred by the **Company**;

        (2)  all expenses of litigation and all costs taxed against the **Insured** in proceedings defended by the **Company**;

(3) the cost of appeal bonds and/or bonds to release attachments, but only for bond amounts within the applicable limit of insurance. **The Company** does not have any obligations to furnish these bonds;

(4) all reasonable expenses incurred by the **Insured** at **Company's** request to assist in the investigation or defense of the claim or suit;

(5) all interest on the full amount of any judgment that accrues after entry of the judgment and before **Company** has paid, offered to pay or deposited in court, the part of the judgment that is within the applicable limit of insurance.

(6) Prejudgment interest awarded against the **Insured** on that part of the judgment the **Company** pays. If **Company** makes an offer to pay the applicable limit of insurance, **Company** will not pay any prejudgment interest based on that period of time after the offer.

3. Pollutant Clean Up and Removal Expense Coverage

In the event of an Occurrence that is covered by the Insurance, the following Additional Coverage also applies. The Limits of Insurance for this coverage is in addition to the Limits of Insurance shown in the Supplemental Declarations.

a. We will pay expenses you incur to extract "pollutants" from land or water if the release, discharge, or dispersal of the "pollutants" is caused by a covered **Occurrence** for which coverage is afforded under this Coverage Form during the term of this Insurance. Such expenses will be paid only if they are reported to us within 180 days of the date of the Occurrence or the expiration date of this Certificate, whichever first occurs.

b. Our Limit of Insurance under this additional coverage shall not exceed $5,000 for the sum of all such expenses occurring during each separate 12-month period commencing with the Certificate inception date.

c. "Pollutants" means any solid, liquid, gaseous, radioactive or thermal irritant or contaminant including, but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

B.   **EXCLUSIONS**

Insurance provided under this Certificate shall not apply as respects any liability or expense:

1.   For loss, destruction, or damage to property to which the **Insured** holds title or in which the **Insured** has any financial interest;

2.   For liability assumed by the **Insured** under any contract or agreement, oral or written, expressed or implied, requiring the **Insured** to exercise a standard of care beyond the reasonable care standard imposed by law on the **Insured** as a public warehouse operator or bailee;

3.   For loss, destruction, or damage to property to the extent that the **Insured** has been released from liability;

4. For loss, destruction, or damage to property when the damage was expected or intended by the **Insured**, regardless of whether or not the actual damage is in excess of that expected or intended;

5. For any penalties, fines, the multiplied portion of any damages or judgment, government assessments, punitive and/or exemplary damages;

6. For loss, destruction, or damage to property of others in the care, custody, or control of the **Insured** while acting as a carrier for hire;

7. For loss, destruction, or damage to property caused by the infidelity or dishonesty of the **Insured** or any person or persons in the employment or service of the **Insured**, whether or not such act or acts occur during the regular hours of employment or service;

8. For loss, destruction or damage caused by or resulting from forged bills of lading, loading, shipping or warehouse receipts;

9. For loss, destruction of, or damage to accounts, bills, currency, deeds, evidences of debt, bullion, precious metals, money, notes, securities, letters of credit or tickets, manuscripts, mechanical drawings, blueprints, documents, records or other valuable papers, furs or garments trimmed with fur, jewels, jewelry, or fine arts;

10. For any unexplained loss of property, and/or any mysterious disappearance of property, and/or any shortage of property provided that such loss, mysterious disappearance and/or shortage is based solely upon a discrepancy between a physical count and a book, computer or other inventory.

11. For loss, destruction, or damage to property caused by inadequate warehouse temperatures, if the inadequate temperature is a result of storing products in excess of the warehouse's storage capacity, provided that the **Insured** knew, or had reason to know, of the overcapacity;

12. For loss, destruction, or damage to property arising out of any processing performed by or on behalf of the **Insured**, unless endorsed hereon. This exclusion does not apply to normal handling, freezing and tempering;

13. Loss or damage to property stored gratuitously or as an accommodation;

14. War and Military Action

   a. War, including undeclared or civil war;

   b. Warlike action by military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   c. Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

15. Nuclear Activity

   Loss from nuclear reaction, nuclear radiation or radioactive contamination, whether deliberate or accidental, controlled or uncontrolled; and whether or not the loss is direct or indirect, proximate or remote.

Ed.02/02 Revised 6/1/04

**C.    LIMITS OF LIABILITY**

1.    The limits of insurance shown in the Declarations and/or Supplemental Declarations apply to all claims for **Property Damage** arising out of any one **occurrence**, and the aggregate payment by the **Company** for all claims under Coverages A.1.a. and A.1.b. shall not exceed the applicable insurance limit per **occurrence**.

2.    The inclusion of more than one **Insured** shall not increase the applicable insurance limit per **occurrence**.

3.    The number of claims resulting from any one **occurrence** shall not increase the applicable insurance limit per **occurrence**.

4.    Payments made on one **occurrence** will not reduce the limits of insurance for another **occurrence**.

5.    Subject to the provisions of Section H., Additional Conditions Paragraph 14 Automatic Coverage, coverage applies only at locations described in the Supplemental Declarations.

**D.    DEDUCTIBLE**

From the total of all claims under Coverages A1.a. and A1.b. above, arising out of any one **Occurrence**, the sum indicated as the deductible in the Supplemental Declarations attached, shall be deducted and this **Company** shall only be liable for the excess of that amount.

**E.    PREMIUM**

The premium charged for this Coverage Part is an annual premium for the coverage provided. The premium to be charged on each anniversary date is to be calculated based on the renewal information submitted.

**F.    DEFINITIONS**

1.    The unqualified word "**Insured**" includes the Named Insured and also includes any executive officer, director, employee or stockholder thereof while acting within the scope of his/her duties as such, and if the Named **Insured** is a partnership, the unqualified word "**Insured**" also includes any partner therein but only with respect to his/her liability as such. However, as respects Notice of Cancellation, it will only be necessary for this **Company** to send such notice to the Named **Insured** as stated in this Insurance.

2.    The term "**Premises**," wherever employed in this Insurance, is defined as that portion of the building (s) located at the address(es) shown in the attached Supplemental Declarations which is (are) occupied by the **Insured** as a public warehouse, or contract warehouse locations as specifically identified as "contract warehouses" under the Schedule of Covered Premises in this policy, including platforms, parking lots, sidetracks and areas immediately adjacent thereto and within 100 feet thereof.

3.    Property Damage" means physical loss, damage or destruction to tangible, personal property owned by others in the care, custody or control of the **Insured** while on the **Premises** of the **Insured** and includes loss of use of such property. **Property Damage** includes the reasonable and necessary costs incurred to remove the debris of such

Ed.02/02 Revised 6/1/04                                                    Page 4 of 8

property after an **Occurrence**.  **Property Damage** includes actual loss of profits not to exceed those profits, which would have been realized from the sale of the lost, damaged or destroyed property.  **Property Damage** does not include any other consequential damages including, but not limited to, personal injury, other lost profits, or damage to reputation or goodwill.

4.    The term "**Occurrence**", wherever employed in this Insurance, is defined as (1) an accident that takes place during the period of insurance under this Certificate, or (2) in the absence thereof, a continuous or repeated exposure to conditions which unexpectedly cause loss or destruction of or damage to tangible property during the period of insurance under this Certificate, and all such exposure to substantially the same general conditions existing at or emanating from any one **Premises** specified in the Supplemental Declarations shall be deemed one **Occurrence**.

5.    The term "**Company**" wherever employed in this Insurance means the Insurer issuing the Insurance and as set out in the Declaration Pages.

## G.    LOSS CONDITIONS

1.    Duties In The Event of Accidents, Claim, or Suit

   a.    The **Insured**, upon knowledge of a claim or of any **Occurrence** which may give rise to a claim, shall give written notice thereof, with the most complete information obtainable, to the **Company** or its authorized agent, as soon as practicable.  If such **Occurrence** involves a violation of law, immediate notice thereof shall be given by the **Insured** to the public police or other peace authorities having jurisdiction.  If claim is made or suit is brought against the **Insured**, the **Insured** shall immediately forward to the **Company** or its authorized agent every demand, notice, summons, or other process received by him or his representative.

   b.    The **Insured** shall take all reasonable means to protect and safeguard customer property at and after an **Occurrence** and cooperate with the **Company** in facilitating the investigation and disposition of claims and suits and, upon the **Company**'s request, shall attend hearings and trials and shall assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, and in the conduct of suits. The **Company** shall not, except at its own cost, voluntarily assume any liability or incur any expense, or settle any claim without the prior written consent of the **Company**. The **Company** reserves the right to settle any claim, suit or other proceedings, as it may deem expedient.

2.    Legal Action Against **Company**

   a.    No action shall lie against the **Company** unless, as a condition precedent thereto, the **Insured** shall have fully complied with all the terms of this Insurance, nor until the amount of the **Insured**'s obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the **Company**.

   b.    Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Insurance to the extent of the insurance afforded by this Certificate.

    c.    Nothing contained in this Certificate shall give any person or organization any right to join the **Company** as a co-defendant in any action against the **Insured**.

    d.    Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the **Company** of any of its obligations hereunder.

## H. ADDITIONAL CONDITIONS

1. Inspections

We have the right, but are not obligated, to:

    a.    make inspections and surveys at any time;

    b.    give you reports on the conditions we find; and

    c.    recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public and we do not warrant that conditions:

    - are safe or healthful; or

    - comply with laws, regulations or codes or standards.

This condition applies not only to us but also to any rating, advisory, rate service or similar organization, which makes insurance inspections, surveys, reports or recommendations.

2. No Benefit to Bailee

No person or organization, other than you will benefit from this insurance.

3. Assignment of Interest

Assignment of interest under this Insurance shall not bind the **Company** until its consent is endorsed hereon. If, however, the **Insured** shall die, or shall be adjudged bankrupt or insolvent and written notice is given to the **Company** within sixty (60) days after the date of such adjudication, this Insurance shall cover the **Insured's** legal representative as **Insured**, provided that notice of cancellation mailed to the Named **Insured** shall be sufficient notice.

4. Other Insurance

Insurance afforded by this Certificate shall be excess of any other insurance or bond available to the **Insured**, which would apply in the absence of this Insurance.

5. Excess Insurance

Permission can only be granted by the **Company** for other insurance excess of the insurance being provided by this Certificate when agreed to in writing by the **Company**.

6.    Concealment, Misrepresentation or Fraud

Coverage under this Insurance is void in any case of fraud by you relating to it. Coverage is also void if you intentionally conceal or misrepresent a material fact concerning:

a.    coverage provided under this Insurance;

b.    the **Insured Premises** or operation(s);

c.    the types of property stored and handled.

7.    Notification

All notices and other communications concerning this Certificate, other than Notices of Loss, shall be addressed to Lockton Companies, 444 West 47th Street, Kansas City, MO 64112-1906.

8.    Notice of Loss

Upon the **Occurrence** of an event which is likely to result in a claim under this Policy, written notice shall be given to the **Company** or its authorized or appointed representative, Horvath & Lieber, P.C., Suite 1400, 10 South LaSalle Street, Chicago, IL, 60603, telephone number 1-800-511-7710, as soon as reasonably possible after the **Insured** has knowledge of the event. If suit is brought against the **Insured** to enforce any claim, the **Insured** shall make every effort to promptly forward the **Company** every summons or other process that may be served upon the **Insured**.

9.    Insurance Under Two Or More Coverages

If two or more of this Certificate's Coverage Forms apply to the same occurrence we will not pay more than the actual amount of the covered loss.

10.    Our Rights To Recover From Others

If any person or organization to or for whom the **Company** makes payment under this insurance has rights to recover damages from another, those rights are transferred to the **Company**. That person or organization must do everything necessary to secure **Company**'s rights and must do nothing after loss to impair them. Any deductibles or other sums paid by the **Insured** shall not be reimbursed to the **Insured** until the **Company** shall have been fully reimbursed for any and all payments made by the **Company**.

11.    Abandonment

There can be no abandonment of any property to us without our written consent.

12.    Common Policy Conditions

All matters provided for in this Coverage Form shall be governed by the terms and

conditions of the Commercial Inland Marine Policy Form, . In the event of any conflict between the provisions of this Coverage Form and the Commercial Inland Marine Policy Form, the provisions of this Coverage Form shall prevail.

13. Cancellation Notice

Under Commercial Inland Marine Policy Form, Common Policy Conditions, the Cancellation Provision A. 2. b. is amended as follows:

It is agreed the number of days before the effective date of the cancellation or non-renewal is changed to 90 days.

14. Automatic Coverage

Automatic Coverage for each newly acquired location is provided for 30 days from the date the **Insured** aquires its ownership, leasehold or other interest in the newly acquired location for a **Limit of Liability** of $1,000,000 subject to the provisions of this Coverage Form. The automatic coverage terminates at the earlier of:

1) the date the **Insured** reports the newly acquired location to **Company** as a scheduled location or

2) upon the expiration of 30 days from the date the **Insured** acquired its ownership, leasehold or other interest in said newly acquired location.

15. IARW Membership

It is a condition of coverage under this policy that the Named Insured maintain its membership, in good standing, with the International Association of Refrigerated Warehouses (IARW). If the Named Insured's membership in the IARW is terminated, for any reason, we shall have the right to cancel this policy in accordance with the Commercial Inland Marine Policy Common Policy Conditions of this policy.

**WAREHOUSEMAN'S LEGAL LIABILITY POLICY**
**COMMON POLICY CONDITIONS**

### A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. If notice is mailed, proof of mailing will be sufficient proof of notice.

### B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

### C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

### D. INSPECTIONS AND SURVEYS

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

**PAGE 1 of 6**

    **b.** Comply with laws, regulations, codes or standards.

  **3.** Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

  **4.** Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. PREMIUMS

The first Named Insured shown in the Declarations:

  **1.** Is responsible for the payment of all premiums, and

  **2.** Will be the payee for any return premiums we pay.

## F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

TJIARW/GEN POLICY CONDITIONS/FEB02

**COMMERCIAL INLAND MARINE CONDITIONS**
**POLICY CONDITIONS**

### A. POLICY COMPOSITION

This policy is composed of this policy jacket, the Commercial Inland Marine Declarations, and one or more Coverage Forms or endorsement.

The conditions in this policy jacket apply in addition to applicable conditions in Commercial Inland Marine Coverage Forms and Endorsements.

However, any Condition contained in a Commercial Inland Marine Coverage Form or Endorsement supersedes any conflicting condition in this jacket.

### B. POLICY LANGUAGE

Parts of this policy are written in simplified language, but some parts may not be. In this policy the following words have the same meaning:

"You" and "Your" refer to the Named Insured shown in the Commercial Inland Marine Declarations.

"Named Insured" refers to You or Your.

"We," "Us" and "Our" refer to the company providing this insurance.

"Company" refers to we, us or our.

### C. POLICY CANCELLATION

Common Policy Condition A., Cancellation, applies to all Commercial Inland Marine Coverage Forms and Endorsements, unless a special state Cancellation Endorsement applies.

**LOSS CONDITIONS**

### A. ABANDONMENT

There can be no abandonment of any property to us.

### B. APPRAISAL

If we and you disagree on the value of the property or the amount of "loss," either may make written demand for an appraisal of the "loss." In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of "loss." If they fail to agree, they will submit their difference to the umpire. A decision agreed to by any two will be binding. Each party will:

1. Pay its chosen appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### C. DUTIES IN THE EVENT OF LOSS

You must see that the following are done in the event of "loss" to Covered Property:

T:\IARW\GEN POLICY CONDITIONS/FEB02

1. Notify the police if a law may have been broken.
2. Give us prompt notice of the "loss." Include a description of the property involved.
3. As soon as possible, give us a description of how, when and where the "loss" occurred.
4. Take all reasonable steps to protect the Covered Property from further damage. If feasible, set the damaged property aside and in the best possible order for examination. Also keep a record of your expenses, for consideration in the settlement of the claim.
5. Make no statement that will assume any obligation or admit any liability, for any "loss" for which we may be liable, without our consent.
6. Permit us to inspect the property and records proving "loss."
7. If requested, permit us to question you under oath, at such times as may be reasonably required, about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.
8. Send us a signed, sworn statement of "loss" containing the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.
9. Promptly send us any legal papers or notices received concerning the "loss."
10. Cooperate with us in the investigation or settlement of the claim.

**D. INSURANCE UNDER TWO OR MORE COVERAGES**

If two or more of this policy's coverages apply to the same "loss," we will not pay more than the actual amount of the "loss."

**E. LOSS PAYMENT**

We will pay or make good any "loss" covered under this Coverage Part within 30 days after:

1. We reach agreement with you;
2. The entry of final judgment; or
3. The filing of an appraisal award.

We will not be liable for any part of a "loss" that has been paid or made good by others.

**F. OTHER INSURANCE**

If you have other insurance covering the same "loss" as the insurance under this Coverage Part, we will pay only the excess over what you should have received from the other insurance. We will pay the excess whether you can collect on the other insurance or not.

**G. PAIR, SETS OR PARTS**

1. Pair or Set. In case of "loss" to any part of a pair or set we may:
   a. Repair or replace any part to restore the pair or set to its value before the "loss"; or
   b. Pay the difference between the value of the pair or set before and after the "loss."
2. Parts. In case of "loss" to any part of Covered Property consisting of several parts when complete, we will only pay for the value of the lost or damaged part.

**H. PRIVILEGE TO ADJUST WITH OWNER**

PAGE 4 of 6

In the event of "loss" involving property of others in your care, custody or control, we have the right to:

1. Settle the "loss" with the owners of the property. A receipt for payment from the owners of that property will satisfy any claim of yours.

2. Provide a defense for legal proceedings brought against you. If provided, the expense of this defense will be at our cost and will not reduce the applicable Limit of Insurance under this insurance.

## I. RECOVERIES

Any recovery or salvage on a "loss" will accrue entirely to our benefit until the sum paid by us has been made up.

## J. REINSTATEMENT OF LIMIT AFTER LOSS

The Limit of Insurance will not be reduced by the payment of any claim, except for total "loss" of a scheduled item, in which event we will refund the unearned premium on that item.

## K. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this insurance has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after "loss" to impair them.

T:/IARW/GEN POLICY CONDITIONS/FEB02

**GENERAL CONDITIONS**

**A. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud, intentional concealment or misrepresentation of a material fact, by you or any other insured, at any time, concerning:

1. This Coverage Part;

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this Coverage Part.

**B. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all the terms of this Coverage Part; and

2. The action is brought within 2 years after you first have knowledge of the "loss."

**C. NO BENEFIT TO BAILEE**

No person or organization, other than you, having custody of Covered Property, will benefit from this insurance.

**D. POLICY PERIOD**

We cover "loss" commencing during the policy period shown in the Declarations.

**E. VALUATION**

The value of property and the most we will pay for "loss" to that property will be the least of the following "amounts":

1. The actual cash value of that property;

2. The cost of reasonably restoring that property to its condition immediately before "loss"; or

3. The cost of replacing that property with property of like kind and quality.

In the event of "loss," the value of property will be determined as of the time of "loss."

T:/IARW/OEN POLICY CONDITIONS/FEB02

## INSTITUTE RADIOACTIVE CONTAMINATION, CHEMICAL, BIOLOGICAL, BIO-CHEMICAL AND ELECTROMAGNETIC WEAPONS EXCLUSION CLAUSE

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith**

1.  In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from

    1.1 ionising radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

    1.2 the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

    1.3 any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter

    1.4 the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes

    1.5 any chemical, biological, bio-chemical, or electromagnetic weapon.

10/11/03

CL370

**Radioactive Contamination Exclusion Clause (USA Endorsement)**

This insurance (reinsurance) is subject to the Institute Radioactive Contamination, Chemical, Biological, Bio-Chemical and Electromagnetic Weapons Exclusion Clause Cl.370 dated 10/11/03 provided that

if fire is an insured peril

and

where the subject matter insured or, in the case of a reinsurance, the subject matter insured by the original insurance, is within the USA, its islands, onshore territories or possessions

and

a fire arises directly or indirectly from one or more of the causes detailed in sub-clauses 1.1, 1.2, 1.4 and 1.5 of the Institute Radioactive Contamination, Chemical, Biological, Bio-Chemical and Electromagnetic Weapons Exclusion Clause Cl.370 dated 10/11/03.

any loss or damage arising directly from that fire shall, subject to the provisions of this insurance (reinsurance), be covered, excluding however any loss damage liability or expense caused by nuclear reaction nuclear radiation or radioactive contamination arising directly or indirectly from that fire.

## INSTITUTE SERVICE OF SUIT CLAUSE (U.S.A.)

It is agreed that in the even of the failure of the Underwriters severally subscribing this insurance (the Underwriters) to pay any amount claimed to be due hereunder, the Underwriters, at the request of the Assured, will submit to the jurisdiction of a court of competent jurisdiction with the United States of America.

Notwithstanding any provision elsewhere in this insurance relating to jurisdiction, it is agreed that the Underwriters have the right to commence an action in any court of competent jurisdiction in the United States of America, and nothing in this clause constitutes or should be understood to constitute a waiver of the Underwriters' rights to remove an action to a United States Federal District Court or to seek remand there from or to seek a transfer of any suit to any other court of competent jurisdiction as permitted by the laws of the United States of America or any state therein.

Subject to the Underwriters' rights set forth above:

(a) It is further agreed that the Assured may serve process upon any senior partner in the firm of:

LeBoeuf, Lamb, Greene & McRae
1025 55th St
New York, NY 10019-5389
U.S.A

and that in any suit instituted against any one of them upon this contract the Underwriters will abide by the final decision of the Court or of any Appellate Court in the event of an appeal.

(b) The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Assured to give a written undertaking to the Assured that they will enter a general appearance upon the Underwriters' behalf in the event such a suit shall be instituted.

(c) The right of the Assured to bring suit as provided herein shall be limited to a suit brought in its own name and for its own account. For the purpose of the suit as herein provided the word Assured includes any mortgagee under a ship mortgage which is specifically named as a loss payee in this insurance and any person succeeding to the rights of any such mortgagee.

(d) Further, pursuant to any statute of any state, territory or district of the United States of America which makes provision therefore, Underwriters hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office (the Officer), as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Assured or any beneficiary

1/11/92

hereunder arising out of this contract of insurance, and hereby designate the above-
named as the person to whom the Officer is authorized to mail such process or a true
copy thereof.

If this clause is attached to a contract of reinsurance the terms insurance and Assured
shall mean reinsurance and Reassured respectively.

**SEVERAL LIABILITY NOTICE**

The subscribing Underwriters' obligations under Contracts of insurance to which they
subscribe are several and not joint and are limited solely to the extent of their individual
subscriptions. The subscribing underwriters are not responsible for the subscription of
any co-subscribing underwriter who for any reason does not satisfy all or part of its
obligations.

LSW 1001                                                    Page 1 of 1

**NOTICE:**

1. The insurance policy that you [have purchased] [are applying to purchase] is being issued by an insurer that is not licensed by the state of California. These companies are called "nonadmitted" or "surplus line" insurers.

2. The insurer is not subject to the financial solvency regulation and enforcement which applies to California licensed insurers.

3. The insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.

4. California maintains a list of eligible surplus line insurers approved by the insurance commissioner. Ask your agent or broker if the insurer is on that list.

5. For additional information about the insurer you should ask questions of your insurance agent, broker, or "surplus line" broker or contact the California Department of Insurance at the following toll-free number: 1-800-927-4357.

AUG-17-2007  11:04      HORVATH WEAVER                    3124196666   P.01/01

Sent By: SAN DIEGO COLD STORAGE;        4748103;        Sep   08  2:18PM;     Page 1/1
To: HARBORSIDE          At: 70.    .87

                                   FAX NO. :760 5980528        Aug. 25 2005 05:55PM  P1

### Memo of Understanding

I, Alberto Sanchez, owner of Del Rancho Foods, agree to the following terms of my
meeting with Jerry Marcus, August 8, 2006 at Marcus Food Company, Inc.

1. I will have my accountant call Jerry tomorrow, August 9, to discuss the viability
   and profitability of Del Rancho Foods.
2. I will send weekly to Jerry my P&L statement for the previous week. In addition I
   will send my balance sheet monthly. I will apprise Marcus Food Company, Inc. of
   my receivables, and make them aware of any problem areas, on a timely basis.
3. I will allow Marcus Food Company, Inc. to file UCC filings on my real business
   property, inventory, and equipment.
4. I am assuming debt of approximately $479,000 comprised of the following
   a. Approximately $156,000 of current receivables due Marcus Food
      Company, Inc.
   b. Approximately $143,000 of products delivered to me by Sergio Hernandez
      that was not invoiced by Marcus Food Company, Inc.
   c. Approximately $80,000 of outstanding receivables to Henry Hernandez
   d. $100,000 of misappropriated funds by Sergio Hernandez from Henry
      Hernandez

_____              _____
Alberto Sanchez                         Jerry Marcus

EXHIBIT
B

TOTAL P.01

1  THE LAW OFFICES OF KEVIN GERRY
   A Professional Corporation
2  Kevin Gerry (State Bar #129690)
   1001 Olive Street, 1st floor
3  Santa Barbara, California 93103
   Telephone: (805) 899-2990
4  Facsimile:   (805) 899-2940

5  Attorneys for Plaintiff Marcus Foods

6

7

8

9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                    FOR THE COUNTY OF SAN DIEGO

12

13

14

15  MARCUS FOODS, a Kansas Corporation,   )   Case No.:
                                          )           37-2007-00066571-CU-CO-CTL
16  Plaintiff,                            )
                                          )
17                                        )   COMPLAINT FOR DAMAGES:
                                          )
18              vs.                       )
                                          )   1)  BREACH OF CONTRACT
19                                        )   2)  CONVERSION
                                          )
20  SAN DIEGO COLD STORAGE, INC., a       )
                                          )
21  California  Corporation,  MIGUEL CUEVA,)
                                          )
22  an individual, SERGIO HERNANDEZ, an   )
                                          )
23  individual, and DOES 1 thru 100, inclusive,)
                                          )
24  Defendants.                           )
                                          )
25  ─────────────────────────────────────

26

27

28  PLAINTIFF MARCUS FOODS ALLEGES AS FOLLOWS:


                                1

E
X
H
I
B
I
T

C

## INTRODUCTION

1.     PLAINTIFF MARCUS FOOD COMPANY, INC., (hereinafter "PLAINTIFF" or "MARCUS FOODS") is a corporation, duly incorporated in the State of Kansas and registered to do business in the State of California.   PLAINTIFF MARCUS FOODS is engaged in the business of marketing and selling food products to buyers and retailers in the in the food services industry.

2.     PLAINTIFF is informed and believes, and upon such information and belief alleges that DEFENDANT SAN DIEGO COLD STORAGE, (hereinafter "DEFENDANT" OR "SAN DIEGO COLD STORAGE") is and at certain times mentioned herein was, a business entity, engaged in business in the State of California as SAN DIEGO COLD STORAGE.

3.     PLAINTIFF is informed and believes, and upon such information and belief alleges that DEFENDANT SAN DIEGO COLD STORAGE is engaged in the business of providing warehouse and cold-storage facilities for hire, pursuant to California Commercial Code §7102(1)(h).  The DEFENDANT'S SAN DIEGO COLD STORAGE facility is located at 1240 West 28th Street, in National City, California.

4.     PLAINTIFF is informed and believes, and upon such information and belief alleges that DEFENDANT MIGUEL CUEVA is employed by DEFENDANT SAN DIEGO COLD STORAGE as the foreman of the SAN DIEGO COLD STORAGE facility located at 1240 West 28th Street, in National City, California.

5.     PLAINTIFF is informed and believes, and upon such information and belief alleges that DEFENDANT SERGIO HERNANDEZ is an independent and self-employed sales-

1  agent engaged in business at DEFENDANT SAN DIEGO COLD STORAGE'S facility

2  located at 1240 West 28th Street, in National City, California.

3  6.    PLAINTIFF does not know the true names or capacities of those DEFENDANTS

4  named herein as DOES 1 through 100.  PLAINTIFF will amend this Complaint to allege

5  their true names and capacities when the same have been ascertained, or according to

6

7  proof at the time of trial.

8  7.    PLAINTIFF is informed and believes, and upon such information and belief

9  alleges, that each fictitiously named DEFENDANT is responsible in some manner for

10

11  the acts and/or occurrences alleged hereafter, and that each DEFENDANT was

12  authorized and/or empowered by the remaining DEFENDANTS to, and did in fact act as

13  the agent and/or employee of the remaining DEFENDANTS in that PLAINTIFF'S losses

14  as herein alleged were proximately caused by their acts and/or omissions.  At all times

15

16  relevant herein, each DEFENDANT was the agent and/or employee of each of the other

17  DEFENDANTS and was at all times relevant herein acting within the purpose and scope

18  of such agency and/or employment.  At all times herein below, unless otherwise

19  specified, DEFENDANTS SAN DIEGO COLD STORAGE, MIGUEL TAMAYO, SERGIO

20  HERNANDEZ and Does 1 through 100, inclusive, will be referred to collectively as

21

22  "DEFENDANTS" in the balance of the Complaint for Damages.

23

24  **STATEMENT OF FACTS**

25

26  8.    On or about June of 2005 PLAINTIFF MARCUS FOODS and DEFENDANT SAN

27  DIEGO COLD STORAGE entered into a written agreement (hereinafter the

28

3

1   "CONTRACT") wherein DEFENDANT SAN DIEGO COLD STORAGE agreed to provide

2   PLAINTIFF MARCUS FOODS with warehouse and cold-storage facilities for hire.  The

3   CONTRACT specifically provides for the transfer of PLAINTIFF MARCUS FOODS

4
    goods and products to DEFENDANT SAN DIEGO COLD STORAGE'S warehouse for
5
    storage and release of said products only to those MARCUS FOODS customers as
6
7   PLAINTIFF MARCUS FOODS would direct (a copy of the CONTRACT attached hereto

8   as Exhibit "A").

9   9.   On or about June of 2005 and continuing for several months thereafter, PLAINTIFF

10  MARCUS FOODS delivered goods and food-products to DEFENDANT SAN DIEGO

11
    COLD STORAGE'S warehouse for safe keeping and cold-storage.
12

13  10.    At the time of each of PLAINTIFF'S delivery of said goods and food-products, a

14  warehouse receipt was issued by DEFENDANT SAN DIEGO COLD STORAGE to

15
    PLAINTIFF MARCUS FOODS therefore.  In return for valuable consideration paid by
16
17  PLAINTIFF MARCUS FOODS, DEFENDANT SAN DIEGO COLD STORAGE accepted

18  each of PLAINTIFF'S goods and food-products, and agreed to the storage and release

19  of PLAINTIFF'S goods and food-products only to those MARCUS FOODS customers as

20  PLAINTIFF MARCUS FOODS would direct.

21
22  11.    In approximately February of 2006 and continuing for several months thereafter,

23  DEFENDANTS and each of them agreed, conspired, planned and engaged in the

24  release of and sale to third parties of PLAINTIFF'S goods and food-products without the

25  knowledge, authorization or consent of PLAINTIFF MARCUS FOODS.

26
27  12.    In approximately August of 2006, PLAINTIFF MARCUS FOODS discovered the

28  ongoing and unauthorized release of and sale to third parties of PLAINTIFF'S goods

                                            4

1  and food-products by the DEFENDANTS and each of them. The unauthorized release

2  of PLAINTIFF'S goods and food-products by the DEFENDANTS was thereafter

3  confirmed by DEFENDANT SAN DIEGO COLD STORAGE in August of 2006 (a copy of

4  DEFENDANT'S Inventory of Missing Product is attached hereto as Exhibit "B").

5

6

7  **FIRST CAUSE OF ACTION**

8  (Breach of Contract – Against Defendant San Diego Cold Storage)

9

10

11  13.    PLAINTIFF MARCUS FOODS re-alleges and incorporates by reference

12  paragraphs 1 through 12, inclusive, as though fully set forth herein.

13  14.    PLAINTIFF MARCUS FOODS has performed all conditions, express and implied,

14  in accord with the CONTRACT.

15  15.    DEFENDANT SAN DIEGO COLD STORAGE'S acts and omissions as alleged

16

17  above, including but not limited to the wrongful release of PLAINTIFF'S goods and food-

18  products constitute a breach of said CONTRACT.

19  16.    PLAINTIFF MARCUS FOODS has demanded that DEFENDANT SAN DIEGO

20  COLD STORAGE return said food products to PLAINTIFF, but DEFENDANT SAN

21

22  DIEGO COLD STORAGE has failed and refused, and continues to fail and refuse to

23  return PLAINTIFF'S goods and food-products.

24  17.    As a direct and proximate result of DEFENDANT SAN DIEGO COLD

25  STORAGE'S breach of said CONTRACT and as a direct and proximate result of the

26  acts and omissions as alleged above, PLAINTIFF MARCUS FOODS has sustained

27

28  damages in an amount to be proven at trial.

5

## SECOND CAUSE OF ACTION

### (Conversion – Against All Defendants)

18.    PLAINTIFF MARCUS FOODS re-alleges and incorporates by reference paragraphs 1 through 17, inclusive, as though fully set forth herein.

19.    By its wrongful release of, possession of and exercise of dominion and control over PLAINTIFF'S goods and food-products, DEFENDANTS and each of them converted the PLAINTIFF'S goods and food-products to and for their own use.  The DEFENDANTS and each of them exercised possession and control of PLAINTIFF'S goods and food-products and at all relevant times therein, had the power to sell to third parties the PLAINTIFF'S goods and food-products without PLAINTIFF MARCUS FOODS' authorization or consent.

20.    As a direct and proximate result of DEFENDANTS, conversion of the PLAINTIFF'S goods and food-products and as a direct and proximate result of the acts and omissions as alleged above, PLAINTIFF MARCUS FOODS has sustained damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF MARCUS FOODS prays for Judgment against DEFENDANTS, and each of them, as follows:

1.    Compensatory damages in an amount according to proof;

2.   Consequential damages reasonably foreseeable as a result of the
DEFENDANT'S acts and/or omissions;

3.   Punitive Damages, as to the Second Cause of Action only, to punish and deter
the DEFENDANTS from future and further actions as described therein;

4.   Attorneys' Fees and Costs of Suit as provided by law; and,

5.   For such other relief as the Court shall deem just and proper.

DATED: April 30, 2007                    THE LAW OFFICES OF KEVIN GERRY

Kevin Gerry
Attorneys for Plaintiff Marcus Foods

7

EXHIBIT "A"

# PLA-ART INTERNATIONAL, INC. dba SAN DIEGO COLD STORAGE

## CONTRACT TERMS AND CONDITIONS

SECTION 1 - DEFINITIONS
As used in this Warehouse Receipt or Contract and Rate Quotation (collectively and/or alternatively "warehouse receipt") the following terms have the following meanings:
(a) STORER. The person, firm, corporation or other entity for whom the GOODS described herein are stored and to whom this Warehouse Receipt is issued and anyone else claiming an interest in the GOODS.
(b) COMPANY. PLA-ART INTERNATIONAL, INC. DBA SAN DIEGO COLD STORAGE. As used in Sections 9 and 10 hereof COMPANY includes officers, directors, employees and agents of the COMPANY while acting within the scope and course of their employment.
(c) LOT. Unit or units of GOODS which are separately identified by the COMPANY.
(d) ADVANCE. All sums due or claimed to be due to COMPANY from STORER or others relating to the GOODS regardless of the source, whether liquidated or not, including but not limited to loans, disbursements, charges made for or on account of STORER or GOODS, necessary for preservation of GOODS or reasonably incurred in their sale pursuant to law.
(e) GOODS. The personal property and/or any portion thereof which is described herein and/or which COMPANY has agreed to receive and/or store pursuant to this Warehouse Receipt.

SECTION 2 - TENDER FOR STORAGE
(a) All GOODS for storage shall be delivered at the warehouse properly marked and packed for handling.
(b) STORER shall furnish, at or prior to such delivery, a manifest showing marks, brands or sizes to be kept and accounted for separately and the class of storage desired. Otherwise the GOODS may be stored in bulk or assorted lots in freezer, cooler or general storage at the discretion of the COMPANY and charges for such storage will be made at the applicable storage rate.
(c) Receipt and delivery of all or any units of a LOT shall be made without subsequent sorting except by special arrangement and subject to a charge.
(d) COMPANY shall store and deliver GOODS only in the packages in which they are originally received unless otherwise agreed to in writing.
(e) Unless STORER shall have given, at or prior to delivery of the GOODS, written instructions to the contrary, COMPANY, in its discretion, may commingle and store in bulk different lots of fungible GOODS, whether or not owned by the same STORER.
(f) COMPANY shall not be responsible for segregating GOODS by production code date unless specifically agreed to in writing.

SECTION 3 - TERMINATION OF STORAGE
(a) COMPANY may, upon written notice, as required by law, require the removal of the GOODS, or any portion thereof, from the warehouse upon the payment of all charges attributable to said GOODS within a stated period, not less than 30 days after such notification. If said GOODS are not so removed, COMPANY may sell them as provided by law and shall be entitled to exercise any other rights it has under the law with respect to said GOODS.
(b) If, in the opinion of COMPANY, GOODS may be about to deteriorate or decline in value to less than the amount of COMPANY'S lien thereon, or may constitute a hazard to other property or to the warehouse or persons, the GOODS may be removed or disposed of by COMPANY as permitted by law. All charges related to said removal shall be paid by STORER.

SECTION 4 - STORAGE LOCATION
(a) The GOODS shall be stored at COMPANY'S discretion at any one or more buildings at COMPANY'S warehouse complex identified on the front side of this Warehouse Receipt. The identification of any specific location within COMPANY'S warehouse complex does not guarantee that the GOODS shall be stored therein.
(b) Subject to any contrary written instructions given by STORER, COMPANY may, at any time, at its expense, and without notice to STORER, remove any GOODS from any room or area of the warehouse complex to any other room or area thereof.
(c) Upon ten (10) days written notice to the STORER, COMPANY may, at its expense, remove the GOODS to any other warehouse complex operated by COMPANY.

SECTION 5 - STORAGE CHARGES
(a) Storage charges commence upon the date that COMPANY accepts care, custody and control of the GOODS, regardless of unloading date or date warehouse receipt is issued. Charges shall be computed separately for each LOT on one of the following optional bases:
(b) If storage rates are quoted on a "SPLIT MONTH BASIS" the storage month shall be a calendar month. A full month's storage charge will apply to all GOODS received between the 1st and 15th, inclusive, of a calendar month. One half month's storage charge will apply on all GOODS received between the 16th and last day, inclusive, of a calendar month. A full month's storage charge shall apply on the 1st day of the next calendar month and each month thereafter on all GOODS then remaining in storage.
(c) If storage rates are quoted on an "ANNIVERSARY BASIS" the storage month shall extend from date of receipt in one calendar month to, but not including, the same date of the next month. If there is no corresponding date in the next month, the storage month shall end on the last day of said next month. A full month's storage charge shall apply on receipt of GOODS and an additional monthly storage charge shall apply to each successive storage month on all GOODS then remaining in storage.
(d) Charges shall be applicable as set forth in the rate quotation or other document issued by COMPANY to STORER and/or in COMPANY'S tariff.
(e) Unless COMPANY specifies otherwise all storage charges are due and payable on the 1st day of storage for the initial month and thereafter on the 1st day of each calendar month.
(f) Rates quoted by weight will, unless otherwise specified, be computed on gross weight and 2,000 pounds shall constitute a ton.

SECTION 6 - HANDLING CHARGES
(a) Unless otherwise specified or quoted by COMPANY, handling charges cover only the ordinary labor and duties incidental to receiving and delivering unitized GOODS on pallets at the warehouse dock during normal warehouse hours but do not include loading and unloading.
(b) Unless otherwise specified, a charge in addition to the regular handling charges will be made for any work performed by COMPANY other than specified in Section (a) at rates which are in effect from time to time, a copy of which rates are available upon request.
(c) When GOODS are ordered out in quantities less than in which received, the COMPANY may make an additional charge for each order or each item of an order.
(d) Delivery by the COMPANY of less than all units of any LOT or of less than all the fungible GOODS stored for STORER shall be made without subsequent sorting except by special arrangement and subject to an additional charge.

SECTION 7 - TRANSFER OF TITLE; DELIVERY
(a) Instructions by STORER to transfer GOODS to the account of another are not effective until delivered to and accepted by COMPANY. Charges will be made for each such transfer and for any rehandling of GOODS deemed by COMPANY to be required thereby. COMPANY reserves the right not to deliver or transfer GOODS to or for the account of others except upon receipt of written instructions properly signed by STORER.
(b) STORER may furnish written instructions authorizing COMPANY to accept telephone orders for delivery. In such case, (1) COMPANY may require that each telephone order be confirmed by STORER in writing within 24 hours, and (2) acceptance by COMPANY of any telephone order shall be at the risk of STORER. COMPANY will not be liable for any loss resulting from delivery made pursuant to telephone order, whether or not so authorized, unless COMPANY failed to exercise reasonable care with respect thereto.
(c) COMPANY shall have a reasonable time to make delivery after GOODS are ordered out and shall have a minimum of 10 business days after receipt of a delivery order in which to locate any misplaced GOODS.
(d) If COMPANY has exercised reasonable care and is unable, due to causes beyond its control, to effect delivery before expiration of the current storage period, the GOODS will be subject to storage charges for each succeeding storage period.
(e) All instructions and requests for delivery of GOODS or transfer of title are received subject to satisfaction of all charges, liens and security interests of COMPANY with respect to the GOODS whether for accrued charges or ADVANCES or otherwise.
(f) COMPANY may require, as a condition precedent to delivery, a statement from STORER holding COMPANY harmless from claims of others asserting a superior right to STORER to possession of the GOODS. Nothing herein shall preclude COMPANY from exercising any other remedy available to it under the law to resolve conflicting claims to possession of the GOODS. All costs, including attorney's fees, incurred by COMPANY relating in any way to COMPANY'S activities referred to in SECTION 7 (f) shall be charged to STORER and shall, for purposes of Section 12 below, be considered "charges present or future with respect to such GOODS" and shall attach as a lien on the GOODS.

SECTION 8 - OTHER SERVICES AND CHARGES
(a) Other services rendered in the interest of STORER or the GOODS are chargeable to STORER. Such services may include, but are not limited to, the following: furnishing of special warehouse space or material, repairing, coopering, sampling, weighing, repiling, inspecting, compiling stock statements, making collections, furnishing revenue stamps, reporting or recording marked weights or numbers, handling railroad expense bills, and handling shipments.
(b) All ADVANCES are due and payable immediately. All charges are due and payable upon the date of invoice. All charges and ADVANCES not paid within 30 days from the due date are subject to an interest charge from the date said charge or ADVANCE became due until paid, at the lesser of 1.5% per month or the maximum amount allowed by law.
(c) STORER may, subject to insurance regulations and reasonable limitations, inspect the GOODS when accompanied by an employee of COMPANY whose time is chargeable to STORER.
(d) In the event of damage or threatened damage to the GOODS, STORER shall pay all reasonable and necessary costs of protecting and preserving the GOODS. When the costs of protecting and preserving stored property are attributable to more than one STORER, said costs shall be apportioned among all affected STORERS on a pro rata basis to be determined by the COMPANY.
(e) COMPANY shall supply dunnage bracing and fastenings where it deems it appropriate on outbound shipments and the cost thereof is chargeable to STORER.
(f) Any additional costs incurred by COMPANY in unloading cars or trucks containing damaged GOODS are chargeable to STORER.
(g) COMPANY shall not be responsible for demurrage charges or delays in loading or unloading unless such demurrage charge or delay was caused solely by COMPANY'S negligence.
(h) A charge in addition to regular storage and handling rates will be made for bonded storage.
(i) COMPANY may assess an additional charge when GOODS, designated for freezer storage, are received at temperatures above 5 degrees Fahrenheit; however COMPANY shall not be responsible for blast freezing GOODS unless STORER specifically requests such services in writing.
(j) All storage, handling and other services may be subject to minimum charges.
(k) STORER agrees to pay COMPANY all costs and ADVANCES including reasonable attorney's fees incurred by COMPANY in connection with the storage, handling and/or disposition of the GOODS, including without limitation, such costs, ADVANCES, and/or fees relating to lawsuits (including Bankruptcy proceedings) involving in any way said GOODS and/or STORER'S performance under this agreement. All such costs, ADVANCES, and fees, for purposes of SECTION 12 below, shall constitute "charges present or future with respect to such GOODS".

SECTION 9 - LIABILITY AND LIMITATION OF DAMAGES
(a) COMPANY shall not be liable for any loss, damage or destruction to GOODS, however caused, unless such loss, damage or destruction resulted from the COMPANY'S failure to exercise such care in regard to the GOODS as a reasonably careful man would exercise under like circumstances. COMPANY is not liable for damages which could not have been avoided by the exercise of such care.
(b) COMPANY and STORER agree that COMPANY'S duty of care referred to in Section 9(a) above does not extend to providing a sprinkler system at the warehouse complex or any portion thereof.
(c) Unless specifically agreed to in writing, COMPANY shall not be required to store GOODS in a humidity controlled environment or be responsible for tempering GOODS.
(d) IN THE EVENT OF LOSS, DAMAGE OR DESTRUCTION TO GOODS FOR WHICH THE COMPANY IS LEGALLY LIABLE, STORER DECLARES THAT COMPANY'S LIABILITY SHALL BE LIMITED TO THE LESSER OF THE FOLLOWING: (1) THE ACTUAL COST TO STORER OF REPLACING, OR REPRODUCING THE LOST, DAMAGED, AND/OR DESTROYED GOODS TOGETHER WITH TRANSPORTATION COSTS TO WAREHOUSE, (2) THE FAIR MARKET VALUE OF THE LOST, DAMAGED, AND/OR DESTROYED GOODS ON THE DATE STORER IS NOTIFIED OF LOSS, DAMAGE AND/OR DESTRUCTION, (3) 50 TIMES THE MONTHLY STORAGE CHARGE APPLICABLE TO SUCH LOST, DAMAGED AND/OR DESTROYED GOODS, (4) $0.50 PER POUND FOR SAID LOST, DAMAGED, AND/OR DESTROYED GOODS, PROVIDED, HOWEVER THAT WITHIN A REASONABLE TIME AFTER RECEIPT OF THIS WAREHOUSE RECEIPT, STORER MAY, UPON WRITTEN REQUEST INCREASE COMPANY'S LIABILITY ON PART OR ALL OF THE GOODS IN WHICH CASE AN INCREASED CHARGE WILL BE MADE BASED UPON SUCH INCREASED VALUATION; FURTHER PROVIDED THAT NO SUCH REQUEST SHALL BE VALID UNLESS MADE BEFORE LOSS, DAMAGE OR DESTRUCTION TO ANY PORTION OF THE GOODS HAS OCCURRED.
(e) The COMPANY'S liability referred to in Section 9(d) shall be STORER'S exclusive remedy against COMPANY for any claim or cause of action whatsoever relating to loss, damage and/or destruction of GOODS and shall apply to all claims including inventory shortage and mysterious disappearance claims unless STORER proves by affirmative evidence that COMPANY converted the GOODS to its own use. STORER waives any rights to rely upon any presumption of conversion imposed by law. In no event shall STORER be entitled to incidental, special, punitive, or consequential damages.

SECTION 10 - NOTICE OF CLAIM AND FILING OF SUIT
(a) COMPANY shall not be liable for any claim of any type whatsoever for loss and/or destruction of and/or damage to GOODS unless such claim is presented, in writing, within a reasonable time, not exceeding 60 days after STORER learns or, in the exercise of reasonable care, should have learned of such loss, destruction and/or damage.
(b) As a condition precedent to making any claim and/or filing any suit, STORER shall provide COMPANY with a reasonable opportunity to inspect the GOODS which are the basis of STORER'S claim.
(c) NO LAWSUIT OR OTHER ACTION MAY BE MAINTAINED BY STORER OR OTHERS AGAINST COMPANY WITH RESPECT TO THE GOODS UNLESS A TIMELY WRITTEN CLAIM HAS BEEN MADE AS PROVIDED IN PARAGRAPH (a) OF THIS SECTION AND UNLESS STORER HAS PROVIDED WAREHOUSEMAN WITH A REASONABLE OPPORTUNITY TO INSPECT THE GOODS AS PROVIDED IN PARAGRAPH (b) OF THIS SECTION AND UNLESS SUCH LAWSUIT OR OTHER ACTION IS COMMENCED WITHIN NINE (9) MONTHS AFTER STORER LEARNS OR, IN THE EXERCIZE OF REASONABLE CARE, SHOULD HAVE LEARNED OF THE LOSS AND/OR DESTRUCTION OF AND/OR DAMAGE TO THE GOODS.

SECTION 11 - INSURANCE
GOODS are not insured by COMPANY and the storage rates do not include insurance on the GOODS unless COMPANY has agreed, in writing, to obtain such insurance for the benefit of STORER.

SECTION 12 - LIEN
COMPANY shall have a lien against the GOODS and on the proceeds thereof for all charges for storage, handling, transportation (including demurrage and terminal charges), insurance, labor and other charges present or future with respect to the GOODS, ADVANCES or loans by COMPANY in relation to the GOODS and for expenses necessary for preservation of the GOODS or reasonably incurred in their sale pursuant to law. COMPANY further claims a lien on the GOODS for all such charges, ADVANCES and expenses in respect to any other property stored by STORER in any warehouse owned or operated by COMPANY or its subsidiaries wherever located and whenever deposited and without regard to whether or not said other property is still in storage.

SECTION 13 - WAIVER - SEVERABILITY
(a) COMPANY'S failure to insist upon strict compliance with any provision of this Warehouse Receipt shall not constitute a waiver or estoppel to later demand strict compliance thereof and shall not constitute a waiver or estoppel to insist upon strict compliance with all other provisions of this Warehouse Receipt.
(b) In the event any section of this Warehouse Receipt or part thereof shall be declared invalid, illegal and/or unenforceable, the validity, legality and enforceability of the remaining sections and parts shall not, in any way, be affected or impaired thereby.

SECTION 14 - AUTHORITY
STORER represents and warrants that it either (i) is the lawful owner of the GOODS which are not subject to any lien or security interest of others; or (ii) is the authorized agent of the lawful owner and/or any holder of a lien or security interest and has full power and authority to enter into the agreement incorporated into this Warehouse Receipt. STORER agrees to notify all parties acquiring any interest in the GOODS of the terms and conditions of this Warehouse Receipt and to obtain, as a condition of granting such an interest, the agreement of such parties to be bound by the terms and conditions of this Warehouse Receipt.

SECTION 15 - NOTICES
All written notices provided herein may be transmitted by any commercially reasonable means of communication and directed to COMPANY at the address on the front hereof and to STORER at its last known address. STORER is presumed to have knowledge of the contents of all notices transmitted in accordance with this Section within five days of transmittal.

SECTION 16-ENTIRE AGREEMENT
This agreement shall constitute the entire agreement between COMPANY and STORER relating to the GOODS and supersedes all existing agreements between them whether written or oral and shall not be changed, amended or modified except by written agreement signed by representatives of COMPANY and STORER.

Revised 10/00

**EXHIBIT "B"**



San Diego Loss Inventory
Missing Boxes Product

| Product | Missing Box Count | Weight | Cost | Dollar Amount |
|---|---|---|---|---|
| | | 90.00 | $ 0.86 | |
| | | 30.00 | $ 0.48 | |

# C&E  Christensen & Ehret LLP

### Illinois ◇ California

222 West Adams Street
Suite 2170
Chicago, Illinois 60606
Telephone (312) 634-1014
Facsimile (312) 634-1018
www.christensenehret.com

Mark E. Christensen
mchristensen@christensenehret.com

Writer's Direct Dial
(312) 214-6353

July 26, 2007

**VIA E-MAIL AND FAX**
Ms. Linda C. Fritz
General Counsel
PLA-Art International dba San Diego Cold Storage
915 Neptune Avenue
Encinitas, California 92024
*LFritz@SDCold.com*
*Linda@ConflictResolution.com*

> Re:     *Marcus Foods v. San Diego Cold Storage, Inc., et al.*
>         Superior Court of California, County of San Diego
>         No. 37-200700066571-CU-CO-CTL

Dear Ms. Fritz:

We are the attorneys representing Certain Lloyds Underwriters (hereinafter "Underwriters"), subscribers to a policy of insurance referenced by certificate · number LON7081-05, with a "Named **Insured**" identified, among others, as PLA-ART International d/b/a San Diego Cold and a policy period from January 1, 2006 to January 1, 2007 (the "Policy"). The limits of liability of $3.5 million and a deductible of $10,000 "per occurrence."

It is our understanding that on May 5, 2007 Marcus Foods filed the captioned complaint against defendants "San Diego Cold Storage, Inc.," its "employee" Miguel Cueva (and/or Tamayo), "self-employed salesman" Sergio Hernandez, and unknown defendants "DOE 1-100."

It is our understanding that the complaint alleges that defendants agreed, conspired, planned and engaged in the release and sale of Marcus Foods goods and food-products without the knowledge, authorization, or consent of Marcus Foods, and as a result, San Diego Cold Storage, Inc. allegedly breached its contract with Marcus Foods, and defendants allegedly converted the product for their own use.

The complaint alleges in relevant part that:

> 3.    * * * SAN DIEGO COLD STORAGE is engaged in the business of providing warehouse and cold-storage facilities for hire, pursuant to California Commercial Code §7102(1)(h). The DEFENDANT'S SAN DIEGO COLD STORAGE facility is located at 1240 West 28th Street, in National City, California.

EXHIBIT
D

Ms. Linda C. Fritz
PLA-Art International dba San Diego Cold Storage
July 25, 2007
Page 2

4. * * * DEFENDANT MIGUEL CUEVA is employed by DEFENDANT SAN DIEGO COLD STORAGE as the foreman of the SAN DIEGO COLD STORAGE facility located at 1240 West 28th Street, in National City, California.

5. * * * DEFENDANT SERGIO HERNANDEZ is an independent and self-employed sales-agent engaged in the business at DEFENDANT SAN DIEGO COLD STORAGE'S facility located at 1240 West 28th Street, in National City, California.

6. PLAINTIFF does not know the true names or capacities of those DEFENDANTS named herein as DOES 1 through 100. PLAINTIFF will amend this Complaint to allege their true names and capacities when the same have been ascertained, or according to proof at the time of trial.

7. * * * fictitiously named DEFENDANT is responsible in some manner for the acts and/or occurrences alleged hereafter, and that each DEFENDANT was authorized and/or empowered by the remaining DEFENDANTS in that PLAINTIFF'S losses as herein alleged were proximately caused by their acts and/or omissions. At all time relevant herein, each DEFENDANT was the agent and/or employee of each of the other DEFENDANTS and was at all times relevant herein acting within the purpose and scope of such agency and/or employment. At all times herein below, unless otherwise specified, DEFENDANTS SAN DIEGO COLD STORAGE, MIGUEL TAMAYO, SERGIO HERNANDEZ and Does 1 through 100, inclusive, will be referred to collectively as "DEFENDANTS" in the balance of the Complaint for Damages.                *       *       *

## STATEMENT OF FACTS

8. On or about June of 2005 PLAINTIFF MARCUS FOODS and DEFENDANT SAN DIEGO COLD STORAGE entered into a written agreement (hereinafter the "CONTRACT") wherein DEFENDANT SAN DIEGO COLD STORAGE agreed to provide PLAINTIFF MARCUS FOODS with warehouse and cold-storage facilities for hire. The CONTRACT specifically provides for the transfer of PLAINTIFF MARCUS FOODS goods and products to DEFENDANT SAN DIEGO COLD STORAGE'S warehouse for storage and release of said products only to those MARCUS FOODS customers as PLAINTIFF MARCUS FOODS would direct.                *       *       *

10. At the time of each PLAINTIFF'S delivery of said goods and food-products, a warehouse receipt was issued by DEFENDANT SAN DIEGO COLD STORAGE to PLAINTIFF MARCUS FOODS therefore. In return for valuable consideration paid by PLAINTIFF    MARCUS FOODS,

Ms. Linda C. Fritz
PLA-Art International dba San Diego Cold Storage
July 25, 2007
Page 3

DEFENDANT SAN DIEGO COLD STORAGE accepted each of PLAINTIFF'S goods and food-products, and agreed to the storage and release of PLAINTIFF'S goods and food-products only to those MARCUS FOODS customers as PLAINTIFF MARCUS FOODS would direct.

11. In approximately February of 2006 and continuing for several months thereafter, DEFENDANTS and each of them agreed, conspired, planned and engaged in the release of and sale to third parties of PLAINTIFF'S goods and food-products without the knowledge, authorization or consent of PLAINTIFF MARCUS FOODS.

12. In approximately August 2006, PLAINTIFF MARCUS FOODS discovered the ongoing and unauthorized release of and sale to third parties of PLAINTIFF'S goods and food-products by the DEFENDANTS and each of them. The unauthorized release of PLAINTIFF'S goods and food-products by the DEFENDANTS was thereafter confirmed by DEFENDANT SAN DIEGO COLD STORAGE in August 2006.

\*     \*     \*

**FIRST CAUSE OF ACTION**
(Breach of Contract - -Against San Diego Cold Storage)

13. PLAINTIFF MARCUS FOODS re-alleges and incorporates by reference paragraphs 1 through 12, inclusive, as though fully set forth herein.

\*     \*     \*

16. PLAINTIFF MARCUS FOODS has demanded that DEFENDANT SAN DIEGO COLD STORAGE return said food products to PLAINTIFF, but DEFENDANT SAN DIEGO COLD STORAGE has failed and refused, and continues to fail and refuse to return PLAINTIFF'S goods and food-products.

\*     \*     \*

**SECOND CAUSE OF ACTION**
(Conversion – Against All Defendants)

18. PLAINTIFF MARCUS FOODS re-alleges and incorporates by reference paragraphs 1 through 17, inclusive, as though fully set forth herein.

19. By its wrongful release of, possession of, and exercise of dominion and control over PLAINTIFF'S goods and food-products, DEFENDANTS and each of them converted the PLAINTIFF'S goods and food-products to and for their own use. The DEFENDANTS and each of them exercised possession and control of PLAINTIFF'S goods and food-products and at all relevant times therein, had the power to sell to third parties the PLAINTIFF'S goods and food-products without PLAINTIFF MARCUS FOODS' authorization or consent.

\*     \*     \*

Ms. Linda C. Fritz
PLA-Art International dba San Diego Cold Storage
July 25, 2007
Page 4

WHEREFORE, PLAINTIFF MARCUS FOODS prays for judgment against DEFENDANT, and each of the, as follows:

1.    Compensatory damages in an amount according to proof;

2.    Consequential damages reasonably foreseeable as a result of the DEFENDANT'S ACTS AND/OR OMISSIONS.

3.    Punitive Damages, as to the Second Cause of Action only, to punish and deter the DEFENDANTS from future and further actions as described therein;

4.    Attorneys Fees and Costs of Suit as provided by law; and

5.    For such other relief as the Court shall deem just and proper.

It is our understanding that Exhibit B of the complaint is an "Inventory of Missing Product," identifying the particular goods allegedly missing (the subject matter of the complaint) and totaling $129,812.90.

It is our further understanding that shortly after suit was served, San Diego Cold Storage, Inc. tendered defense of the complaint to Underwriters.

Our investigation shows that the Marcus Foods goods and food-products in question are neither lost, missing, damaged, or destroyed. Rather, it is our understanding that they were released from San Diego Cold Storage, Inc.'s facility to Marcus Foods customer(s), who currently possess the product. We understand that more product were released to these customers than allegedly authorized by Marcus Foods. It is our further understanding that these goods and food-products can be retrieved from the customer(s) in possession and returned to Marcus Foods, or alternatively, that these customer(s) may be willing to pay Marcus Foods for the product.

We regret to inform you that for the reasons delineated in this letter, Underwriters must decline San Diego Cold Storage, Inc.'s tender of defense.

We draw to your attention that the Policy provides "warehouseman's legal liability coverage" as follows:

### WAREHOUSEMAN'S LEGAL LIABLITY COVERAGE

A.    **COVERAGES**

Ms. Linda C. Fritz
PLA-Art International dba San Diego Cold Storage
July 25, 2007
Page 5

In consideration of premium charges hereinafter provided and subject to the following terms, conditions, exclusions, and limitations, this **Company** agrees:

1.    a.    To pay on behalf of the **Insured** those sums that the **Insured** becomes legally obligated to pay for **Property Damage** by reason of liability imposed upon the **Insured** as a warehouse operator or bailee resulting from an **occurrence** during the Certificate period.

2.    a.    We[1] may, at our discretion, investigate any **occurrence** and settle any claim or suit that may result, but the amount we will pay for damages, is limited as described in section C. Limits of Liability.

    b.    The **Company** has the right and duty, to defend any suit or other proceedings which may be brought against the **Insured** to enforce claims, even if such suits or proceedings are groundless, false or fraudulent. But:
        *    *    *

    (4)    **Company** has no duty to defend the **Insured** against any suit or other proceedings seeking damages to which this insurance policy does not apply.

    c.    We will pay, irrespective of the **Company's** "Limit(s) of Liability" otherwise specified herein:
        *    *    *

    (2)    all expenses of litigation and all costs taxed against the **Insured** in proceedings defended by the **Company**.
        *    *    *

**F.**    <u>**DEFINITIONS**</u>

1.    The unqualified word "**Insured**" includes the Named **Insured** and also includes any executive officer, director, employee, or stockholder thereof while acting within the scope of his/her duties as such, and if the Named **Insured** is a partnership, the unqualified word "**Insured**" also includes any partner therein but only with respect to his/her liability as such. However, as respects Notice of Cancellation, it will only be necessary for this **Company** to send such notice to the Named **Insured** as stated in this Insurance.

---

[1] The Policy defines the words "we," "us," and "our" as Underwriters and the words "you" and "your" as the "Named **Insured**." The "**Company**" is Underwriters.

Ms. Linda C. Fritz
PLA-Art International dba San Diego Cold Storage
July 25, 2007
Page 6

\*    \*    \*

3. **"Property Damage"** means physical loss, damage or destruction to tangible, personal property owned by others in the care, custody or control of the Insured while on the Premises of the Insured and includes loss of use of such property. **Property Damage** includes the reasonable and necessary costs incurred to remove the debris of such property after an **Occurrence**. Property Damage includes actual loss of profits not to exceed those profits, which would have been realized from the sale of the lost, damaged or destroyed property. **Property Damage** does not include any other consequential damages including, but not limited to, personal injury, other profit losses, or damage to reputation or goodwill.

4. The term **"Occurrence"** wherever employed in this Insurance, is defined as (1) an accident that takes place during the period of insurance under this Certificate, or (2) in the absence thereof, a continuous or repeated exposure to conditions which unexpectedly cause loss or destruction of or damage to tangible property during the period of insurance under this Certificate, and all such exposure to substantially the same general conditions existing at or emanating from any one **Premises**[2] specified in the Supplemental Declarations shall be deemed one **Occurrence**.

Please be advised that Underwriters have no duty to defend the complaint because it does not allege **"Property Damage"** under the Policy; specifically, there is no *"physical loss, damage or destruction to tangible, personal property* owned by others in the care, custody or control of the **Insured** \*\*\*." (Emphasis added.) Here, the Marcus Foods goods and food-products in question are neither lost, missing, damaged, or destroyed. Rather, they are fully intact in Marcus Foods customer(s)' possession and may be retrieved or returned to Marcus Foods. Alternatively, these customer(s) may be wiling to pay Marcus Foods for the product.

Please be further advised that Underwriters have no duty to defend the complaint because it does not allege an **"Occurrence"** under the Policy; specifically, defendants' alleged conduct neither constitutes an "accident," nor a "continuous or repeated exposure to conditions which unexpectedly cause loss \*\*\*." Here, where the complaint alleges that defendants *"agreed, conspired, planned and engaged in the release of and sale* to third parties of [Marcus Foods goods] without [its] knowledge, authorization of consent" (emphasis added), the gist and

---

[2] The Policy defines **"Premises"** as the building located at the address shown in the Supplemental Declarations, which is occupied by the **"Insured"** as a public warehouse. Here, the Schedule of Covered Premises lists the location as 1240 West 28th Street, National City, CA 91950-6319.

Ms. Linda C. Fritz
PLA-Art International dba San Diego Cold Storage
July 25, 2007
Page 7

implication of the complaint is that defendants' alleged conduct was deliberate and calculated. Moreover, the complaint does not allege exposure to some sort of physical harm (wind, cold, mold, etc.) that results in property damage.

Underwriters also reserve rights to deny coverage to the extent that defendant "San Diego Cold Storage, Inc." is not the same entity as PLA-Art International dba San Diego Cold and therefore is not an **"Insured"** under the Policy. Underwriters also reserve rights to deny coverage to the extent that defendants Miguel Cueva (and/or Tamayo), Sergio Hernandez, and various unknown defendants "DOE 1-100" are not the insured's "employees" and, therefore, are not **"Insureds"** under the Policy.

Underwriters reserve rights to deny coverage on the basis that several exclusions under Section B of the Policy may be applicable in this case, namely, that there is no coverage:

1.    For loss, destruction, or damage to property to which the **Insured** holds title or in which the **Insured** has any financial interest.

2.    For liability assumed by the **Insured** under any contract or agreement, oral or written, expressed or implied, requiring the **Insured** to exercise a standard of care beyond the reasonable care standard imposed by law on the **Insured** as a public warehouse operator or bailee.

3.    For loss, destruction, or damage to property to the extent that the **Insured** has been released form liability.

4.    For loss, destruction, or damage to property when the damage was expected or intended by the **Insured**, regardless of whether or not the actual damage is in excess of that expected or intended.

5.    For any penalties, fines, the multiplied portion of damages or judgment, government assessments, punitive and/or exemplary damages.

6.    For loss, destruction, or damage to property of others in the care, custody, or control of the **Insured** while acting as a carrier for hire.

7.    For loss, destruction, or damage to property caused by the infidelity or dishonesty of the Insured or any person or persons in the employment or service of the Insured, whether or not such an act or acts occur during the regular hours of employment or service.

10.   For any unexplained loss of property, and/or any mysterious disappearance of property, and/or any shortage of property provided that such loss, mysterious disappearance and/or shortage is based solely upon a discrepancy between a physical count and a book, computer or other inventory.

Ms. Linda C. Fritz
PLA-Art International dba San Diego Cold Storage
July 25, 2007
Page 8

> 12. For loss, destruction, or damage to property arising out of any processing performed by or on behalf of the **Insured**, unless endorsed herein. This exclusion does not apply to normal handling, freezing, and tempering.

Underwriters also reserve rights to deny coverage pursuant to the Other Insurance clauses in the Policy's Section H, Additional Conditions, Paragraph 4 and Commercial Inland Marine Conditions, Loss Conditions, Paragraph F.

Underwriters reserve rights to deny coverage pursuant to the Concealment, Misrepresentation or Fraud clauses in the Policy's Section H, Additional Conditions, Paragraph 6 and Commercial Inland Marine Conditions, General Conditions, Paragraph A.

Underwriters reserve rights to deny coverage pursuant to § 533 of the Insurance Code, which provides:

> § 533 Wilful act of insured
>
> > An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others.

Underwriters draw to your attention the Notice clauses in (1) the Policy's Section G, Loss Conditions, Paragraph 1, Duties In The Event of Accidents, Claim, or Suit, which provides:

> a. The **Insured**, upon knowledge of a claim or of any **Occurrence** which may give rise to a claim, shall give written notice thereof, with the most complete information obtainable, to the **Company** or its authorized agent, as soon as practicable. If such **Occurrence** involves a violation of law, immediate notice thereof shall be given by the **Insured** to the public police or other peace authorities having jurisdiction. If claim is made or suit is brought against the **Insured**, the **Insured** shall immediately forward to the **Company** or its authorized agent every demand, notice, summons, or other process received by him or his representative.

and (2) Section H, Additional Conditions, Paragraph 8, Notice of Loss, which provides:

> Upon the **Occurrence** of an event which is likely to result in a claim under this Policy, written notice shall be given to the **Company** or its authorized or appointed representative, Horvath & Lieber, P.C., Suite 1400, 10 South LaSalle Street, Chicago, IL, 60603, telephone number 1-800-511-7710, as soon as reasonably possible after the **Insured** has knowledge of the event. If suit is brought against the **Insured** to enforce any claim, the **Insured** shall make every effort to promptly forward to the **Company** every summons or other process that may be served upon the **Insured**.

Ms. Linda C. Fritz
PLA-Art International dba San Diego Cold Storage
July 25, 2007
Page 9


Underwriters reserve rights to deny coverage pursuant to these Notice clauses where in this case, Marcus Foods allegedly informed San Diego Cold Storage, Inc. about the unauthorized release of goods in August 2006, but San Diego Cold Storage, Inc. waited until June 2007 (ten months later) after suit was filed to notify Underwriters of the alleged missing products.

Underwriters' coverage position is based upon the information that is currently available. Any failure to cite other policy terms, conditions, or exclusions at this time shall not preclude Underwriters from citing other policy terms, conditions, or exclusions at such time that additional information gives rise to their applicability. Underwriters expressly reserve rights to rely on those terms and conditions in deciding whether or not coverage is afforded under the Policy.

Underwriters in no way waive any rights by any statement in this letter, including their right to sue for declaratory relief with respect to this matter.

As a formality, California law requires that we advise you that if you have any objections to Underwriters' handling of a claim or disagreements with the coverage afforded by the Policy, you may contact the California Department of Insurance at the following location:

The California Department of Insurance
Claim Services Bureau, 11th Floor
300 South Spring Street
Los Angeles, California 90013
(800) 927-4357 or (213) 897-8921


Please be advised that Underwriters' investigation into coverage continues and this letter may be supplemented at a later date if and when new information comes to light or events occur. Underwriters will be happy to consider and evaluate any new information San Diego Cold Storage, Inc. chooses to provide.

Sincerely yours,

*Mark E. Christensen*

Mark E. Christensen

MEC/JCH/rmcl

cc:    Mr. Edward F. Plant
San Diego Refrigerated Services, Inc.
P.O. Box 85001
San Diego, California 92186-5001
efp@harborsidesd.com

Ms. Linda C. Fritz
PLA-Art International dba San Diego Cold Storage
July 25, 2007
Page 10


Ms. Connie M. Phipps
Vice President
Account Executive
Lockton Companies, LLC
444 West 47th Street, Suite 900
Kansas City, Missouri 64112-1906
*CPhipps@lockton.com*

Jack C. Hsu

114745

JS.44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a)  PLAINTIFFS**

CATLIN UNDERWRITING AGENCIES LIMITED
London, England

**DEFENDANTS**

SAN DIEGO REFRIGERATED SERVICES INC.
ET AL.

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant San Diego
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c)  Attorney's (Firm Name, Address, and Telephone Number)

Christensen & Ehret, LLP, 222 W. Adams, #2170
Chicago, IL 60606 (312) 634-1014

Attorneys (If Known)

**'08 CV 0173 WQH JMA**

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ❏ 1  U.S. Government Plaintiff
- ❏ 2  U.S. Government Defendant
- ❏ 3  Federal Question (U.S. Government Not a Party)
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated or Principal Place of Business in This State | ❏ 4 | ☒ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated and Principal Place of Business in Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 610 Agriculture | ❏ 422 Appeal 28 USC 158 | ❏ 400 State Reapportionment |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 362 Personal Injury - Med. Malpractice | ❏ 620 Other Food & Drug | ❏ 423 Withdrawal 28 USC 157 | ❏ 410 Antitrust |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 365 Personal Injury - Product Liability | ❏ 625 Drug Related Seizure of Property 21 USC 881 | | ❏ 430 Banks and Banking |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | ❏ 368 Asbestos Personal Injury Product Liability | ❏ 630 Liquor Laws | **PROPERTY RIGHTS** | ❏ 450 Commerce |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | | ❏ 640 R.R. & Truck | ❏ 820 Copyrights | ❏ 460 Deportation |
| ❏ 151 Medicare Act | ❏ 340 Marine | **PERSONAL PROPERTY** | ❏ 650 Airline Regs. | ❏ 830 Patent | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ❏ 345 Marine Product Liability | ❏ 370 Other Fraud | ❏ 660 Occupational Safety/Health | ❏ 840 Trademark | ❏ 480 Consumer Credit |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 371 Truth in Lending | ❏ 690 Other | **SOCIAL SECURITY** | ❏ 490 Cable/Sat TV |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 380 Other Personal Property Damage | **LABOR** | ❏ 861 HIA (1395ff) | ❏ 810 Selective Service |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 385 Property Damage Product Liability | ❏ 710 Fair Labor Standards Act | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 195 Contract Product Liability | | | ❏ 720 Labor/Mgmt. Relations | ❏ 863 DIWC/DIWW (405(g)) | ❏ 875 Customer Challenge 12 USC 3410 |
| ❏ 196 Franchise | | | ❏ 730 Labor/Mgmt.Reporting & Disclosure Act | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| ❏ 210 Land Condemnation | ❏ 441 Voting | ❏ 510 Motions to Vacate Sentence | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ❏ 892 Economic Stabilization Act |
| ❏ 220 Foreclosure | ❏ 442 Employment | **Habeas Corpus:** | ❏ 791 Empl. Ret. Inc. Security Act | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 893 Environmental Matters |
| ❏ 230 Rent Lease & Ejectment | ❏ 443 Housing/ Accommodations | ❏ 530 General | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 894 Energy Allocation Act |
| ❏ 240 Torts to Land | ❏ 444 Welfare | ❏ 535 Death Penalty | | | ❏ 895 Freedom of Information Act |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 540 Mandamus & Other | | | ❏ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | ❏ 550 Civil Rights | | | ❏ 950 Constitutionality of State Statutes |
| | ❏ 440 Other Civil Rights | ❏ 555 Prison Condition | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ❏ 2 Removed from State Court
- ❏ 3 Remanded from Appellate Court
- ❏ 4 Reinstated or Reopened
- ❏ 5 Transferred from another district (specify)
- ❏ 6 Multidistrict Litigation
- ❏ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC 1332 (a)(2)
Brief description of cause:
Declaratory judgment action on insurance policy

**VII. REQUESTED IN COMPLAINT:**

❏ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ❏ Yes ❏ No

**VIII. RELATED CASE(S) IF ANY**

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE  January 28, 2008

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 146975   AMOUNT 350.   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

1/29/08

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 146975    — SR**

**January 29, 2008
15:45:09**

**Civ Fil Non-Pris**
USAO #.: 08CV0173 CIV. FIL.
Judge..: WILLIAM Q HAYES
Amount.:                    $350.00 CK
Check#.: BC#4158

**Total—> $350.00**

FROM: CATLIN UNDERWRITING AGENCIES
      V.  SD REFRIGERATED SVCS.
      CIVIL FILING